# In the
# United States Court of Appeals
# For the Seventh Circuit

No. 12-2466

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER EADS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 11-CR-239 — **Tanya Walton Pratt**, *Judge.*

ARGUED APRIL 15, 2013 — DECIDED SEPTEMBER 6, 2013

Before RIPPLE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* At the age of twenty-six, Christopher Eads was charged with possession and distribution of child pornography and tampering with a potential witness. The district court cautioned him about the perils of self-representation in a criminal trial, but he chose to represent himself anyway. Eads stipulated that the images charged in the indictment constituted child pornography, but he

claimed that he was being framed and that the images belonged to someone else. So over Eads's objection, the district court allowed the government to introduce several photographs and short video clips of the child pornography discovered on Eads's home computer to show he knowingly possessed and distributed these images. The jury also heard several telephone calls Eads made to his wife urging her to recant her earlier statements to police and to tell them that the pornography found on his home computer was not his. After a four-day trial, the jury convicted Eads on all counts, and the district court sentenced him to 480 months' imprisonment.

Eads now raises a litany of challenges to his convictions and sentence on appeal, but none have any merit. He claims that the district court abused its discretion in allowing him to represent himself at trial, but the court questioned him at length before allowing him to proceed pro se. And while we agree with Eads that the district court erred in not thoroughly explaining on the record why it admitted the evidence of child pornography, the images were not unfairly prejudicial and the additional evidence of his guilt was overwhelming. The jury was also presented with sufficient evidence of Eads's attempts to corruptly persuade his wife to testify falsely, and so we will not overturn the jury's guilty verdict on the witness tampering charge. Eads further claims that the district court should have granted him a new trial. But the district court held an evidentiary hearing on the matter and properly found no newly discovered evidence to support a new trial. Lastly, notwithstanding Eads's protestations to the contrary, the district court carefully considered the factors under 18 U.S.C. § 3553(a) as they applied to Eads and

his overall offense conduct before sentencing him. Therefore, we affirm the district court's judgment in all respects.

## I. BACKGROUND

Sometime in May 2011, Detective Darin Odier of the Indianapolis Metropolitan Police Department's Cyber Crimes Unit found an Internet Protocol (IP) address offering 400 files of nude children through a file sharing program called "Shareaza." Detective Odier obtained a subpoena for the Comcast subscriber associated with the IP address, and it came back with the name "Christopher Eads." By the time Detective Odier had prepared a search warrant, the IP address that belonged to Eads was no longer active. But by October 26, 2011, it was up and running again. At this time, Detective Odier downloaded five files associated with Eads's IP address and found images with code names associated with child pornography such as, "Pedo Babyshivid Childlover Private Daughter Torpedo Ranchi Lolita" and "Pedo Dad F*cks Toddler Boy."

On November 15, 2011, detectives conducted a search of Eads's home and found two laptop computers, compact discs, thumb drives, and a Bersa .40-caliber handgun. When detectives searched the living room laptop, they discovered 6,937 images of child pornography (including one image with text written over it offering to rent a child for sex) and over thirty minutes in total of child pornography videos.[1]

---

[1] When detectives turned on the living room computer, Shareaza automatically activated and was in the process of downloading twenty-five additional video files containing child pornography.

Both Eads and his wife, Rachel Smith Eads, were home during the search and Rachel agreed to speak with law enforcement. Eads yelled through the house, "Don't tell them anything." Rachel told detectives that after dating Eads for a couple of months, she found an FBI badge in his pocket. When she confronted him about it, he told her that he was an undercover FBI agent and that he had to download child pornography as part of his duties. Rachel further told detectives that the handgun they had found in the home belonged to Eads (which was a problem for Eads because he is a convicted felon).

Eads was later arrested and taken into federal custody. While in custody from November 29–30, 2011, Eads called Rachel from jail numerous times. Clearly frustrated and upset by Rachel's statements to police, Eads repeatedly demanded that she "make this right" and recant her statements. Eads proposed that Rachel write to the judge assigned to his case and state that Eads's former friend and houseguest, Nathan Asbury, was trying to set him up. Rachel promised to help her husband.

## A. Pretrial Issues

On December 21, 2011, a grand jury indicted Eads on charges of distributing child pornography (Count 1), possessing child pornography (Count 2), being a felon in possession of a firearm (Count 3), impersonating a federal agent (Count 4), and tampering with a witness (Count 5). On February 9, 2012, the district court conducted a final pretrial conference with the parties where several matters germane to the instant appeal were discussed. First, the court confirmed that the government did not plan to call Rachel Eads as a witness and had agreed it would not introduce any

statements she made to police during the November 15 search of her home. However, the government stated its intention to play recordings of the phone conversations between Eads and Rachel while he was in jail. Second, the court stated that it had "reviewed the parties' proposed exhibits" and that "[t]he parties have resolved issues relating to the publication of pornographic images and videos to the jury." The court went on to encourage the parties "to stipulate that the videos depict unlawful child pornography" in order to "allow the Government to show far shorter excerpts of the videos."

The parties followed the district court's advice and entered into several stipulations before trial. They agreed, among other things, that each of the charged images in Counts 1 and 2 of the indictment consisted of "a visual depiction having involved the use of a minor, that is, a person under the age of 18, engaging in sexually explicit conduct and each of such visual depictions was of such conduct."

Six days before trial, Eads filed a notice of his intent to represent himself. The district court held a hearing on the matter to determine whether Eads understood the consequences of self-representation. The district court asked him whether he was "a hundred percent sure" he wanted to represent himself a trial, whether the decision was made voluntarily, and whether he could be convinced to use a lawyer instead. But Eads was adamant in his desire to represent himself, and so the district court accepted his decision and appointed standby counsel.

## B. The Trial

A four-day jury trial was held on the distribution and possession of child pornography charges, as well as the witness tampering charge.[2] In his opening statement, Eads maintained that (1) he was not responsible for the child pornography found on his living room computer, (2) the computer was only used by houseguests, and (3) Nathan Asbury was responsible for the images. Early in the trial, Detective Odier testified about his investigation and explained how he downloaded images from shared files on Eads's computer. The government sought to admit five hard copy printouts of the images from these files, but Eads objected, citing Federal Rule of Evidence 403. The court asked him to explain his objection and he said: "I believe that it's already been established that it is what it is … . I think it's a little prejudiced." The government asked that the court admit the images because the jurors must "decide if they are, in fact, visual depictions of sexual explicit conduct." The court pointed out that no stipulations regarding the images were in evidence at that point in the proceedings and overruled Eads's objection, stating: "These photographs are relevant to the elements that the government has to prove in this case beyond a reasonable doubt."

Later in the trial, the government stated that it intended to publish small clips of the pornographic videos charged in Count 2. Again, Eads objected, stating: "I think it's prejudiced … . I just believe it's already been established, a stipulation that it is what it's portrayed to be, child pornogra-

---

[2] Counts 3 and 4 were severed, set for separate trial, and eventually dropped.

phy." And again, the district court overruled the objection, stating that "it goes to the person's—a user of this computer's knowledge because of where these items were found … . So you know, that's all going to be relevant to the issue of who's the person using the computer … . Rule 403 prohibits evidence that is unreasonably prejudicial. The government is going to minimize the prejudice of these exhibits by only playing short clips." In total, the jury viewed a little over three minutes of footage.

Eads also objected to the government's proposed introduction of his eight recorded jailhouse phone calls with Rachel and the accompanying written transcripts. Eads argued that given his emotional state at the time, the recordings were extremely prejudicial. The judge overruled Eads's objection, finding that the probative value of the tapes outweighed any prejudicial impact. The jury ultimately convicted Eads on all counts.

### C. Motion for New Trial and Sentencing

Eads filed a pro se motion for a new trial, and again, declined the court's offer to appoint him counsel. The court held an evidentiary hearing on his motion and Eads called several witnesses. Rachel presented a new story that Nathan Asbury had lived with her and Eads in the past, and that during Asbury's stay, she had seen him on the living room computer viewing child pornography. She further claimed that she and Eads were out of town on October 26, 2011 (the day Detective Odier downloaded the child pornography), and that Asbury was there to watch their dog. Rachel said that she lied in her initial statements to police officers because they threatened to take her children away. As a result, the government introduced several statements from Rachel's

interview with detectives as impeachment evidence, including her statements that: (1) no one was able to use the computer in the living room except for Eads; (2) Eads looked at child pornography in order to turn it over to the FBI for his job; and (3) Rachel did not have the password to the computer. Asbury also testified. He denied being at Eads's home on the days when detectives tracked pornography uploads and denied having ever looked at child pornography on Eads's computer. In fact, Asbury was incarcerated between June 14 and August 23, 2011—a time period in which there was a significant amount of user activity on the living room laptop, some of which involved downloading and viewing child pornography. The district court therefore rejected Eads's assertion that he had any newly discovered evidence to offer and denied the motion for a new trial.

The case proceeded to sentencing. Eads made several unsuccessful objections pertaining to the Probation Department's calculations under the United States Sentencing Guidelines. The district court accepted the Presentence Investigation Report's recommended adjusted offense levels of 47 for Counts 1 and 2 (distribution and possession of child pornography), and 41 for Count 5 (witness tampering). Given that Eads's criminal history points put him in criminal history category V, his Guidelines range for imprisonment was life. After a lengthy discussion of the factors under 18 U.S.C. § 3553(a), the court sentenced him to a term 480 months' imprisonment. Eads now appeals his conviction and sentence.

## II. ANALYSIS

Eads presents numerous arguments on appeal. We note at the outset that we have reviewed the brief filed by Eads's

counsel as well as Eads's pro se brief. Though we have said before that "a defendant does not have an affirmative right to submit a pro se brief when represented by counsel," *United States v. Gwiazdzinski*, 141 F.3d 784, 787 (7th Cir. 1998), "nothing precludes an appellate court from accepting the pro se brief and considering the arguments contained therein for whatever they may be worth." *Hayes v. Hawes*, 921 F.2d 100, 101–02 (7th Cir. 1990). On January 4, 2013, this court ordered that Eads's opening pro se brief only raise certain issues related to his ability to represent himself at trial, the sufficiency of the evidence at trial, and the denial of his motion for a new trial. His counsel's brief challenges the district court's admission of certain evidence at trial, the sufficiency of the evidence, and his sentence. We will address each argument in turn below (to the extent that they warrant discussion), but we condense the overlapping arguments and decline to address the other unrelated issues Eads raises in his pro se brief that go beyond the scope of our order.

### A. No Abuse of Discretion in Allowing Self-Representation

The first matter to resolve is whether the district court abused its discretion in allowing Eads to represent himself at trial. In considering Eads's waiver of his right to counsel, our task is to examine the record as a whole to see if he "knowingly and intelligently" waived his right to counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). In determining whether Eads's decision was made knowingly and intelligently, we consider (1) whether and to what extent the district court conducted a "formal hearing" into Eads's decision to represent himself, (2) whether there is other evidence in the record that establishes that Eads "understood the disad-

vantages of self-representation," (3) Eads's "background and experience," and (4) the "context" of Eads's decision to proceed pro se. *See United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000) (citations omitted).

In this case, the district court questioned Eads at length about whether he had ever studied law, represented himself in a criminal proceeding, understood the charges and penalties he was facing, and understood the sentencing guidelines. Finally, the court stated:

> Mr. Eads, I need to advise you that, in my opinion, a trained lawyer would defend you far better than you could defend yourself, and that I think it's unwise of you to try to represent yourself. You're not familiar with the law. You're not familiar with court procedure. You're not familiar with the Rules of Evidence. And so I strongly urge you not to try to represent yourself but you do have a constitutional right to do that.

The court also determined that no one else had coaxed him into self-representation and that Eads's court-appointed lawyer had discussed the consequences of trying the case without the benefit of counsel. We have no doubt that the district court conducted its hearing in conformity with *Faretta* and ensured that Eads was fully aware of the hazards and disadvantages of self-representation. *See United States v. Sandles*, 23 F.3d 1121, 1126 (7th Cir. 1994) (citing *United States v. Belanger*, 936 F.3d 916, 918 (7th Cir. 1991)) ("strongly suggest[ing] that a trial court, at minimum, inquire of the defendant's age and level of education, and inform him of the crimes with which he was charged, the nature of those charges, and the possible sentences they carry").

Eads contends in his pro se brief on appeal that he was on prescription anti-anxiety medication during his trial and would not have proceeded pro se had he not been under the influence of this medication. But Eads never once disclosed any medication issues before trial, and throughout the course of the proceedings he appeared lucid, competent, and mounted a vigorous defense on his own behalf. Moreover, the district court asked Eads during trial, at the post-trial hearing, and at his motion for a new trial whether he wished to have standby counsel take over for him. He declined the offer at each juncture. The record establishes that Eads knew what he was doing and made his choice with his "eyes open." *Faretta*, 422 U.S. at 835. We therefore conclude that Eads's waiver of his right to counsel was knowing and intelligent.

## B. Failure to Conduct Thorough Rule 403 Balancing Test Was Harmless

Next, Eads contends that the district court erred in allowing the government to show the jury pictures and video clips of the child pornography discovered in his home. Eads argues that his stipulation to the content of the images obviated the government's need to introduce any of the images, and that they were only shown to inflame the jury. Federal Rule of Evidence 403 requires the district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. We review a district court's decision to admit or exclude evidence for abuse of discretion, but "when it comes to the necessarily context-sensitive evaluation of a claim under Rule 403, we give special deference to the district court's findings and reverse only when no reasonable person could

take the view adopted by the trial court." *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008) (citations and internal quotation marks omitted).

### 1. Courts Need to Review Contested Images

Eads first argues that the district court erred in failing to examine the pornographic pictures and videos for itself before admitting the evidence. Neither party appears to have explicitly requested that the district court review the images charged in Counts 1 and 2 before trial, but the government directs us to the district court's "Entry Following Pretrial Conference" in which the court stated that it had "reviewed the parties' proposed exhibits." Those exhibits included the pornographic images and videos the government sought to publish to the jury. However, the government conceded at oral argument that it is not certain whether the district court reviewed the images, or only reviewed the list of exhibits. Lacking any conclusive determination in the record as to whether the district court viewed the challenged images, we are once again compelled to reiterate that the better and "safest course … is for the court to review the contested evidence for itself" in evaluating whether the potential prejudice to the defendant substantially outweighs any probative value, especially given the highly inflammatory nature of this type of evidence. *See United States v. Loughry*, 660 F.3d 965, 971–72 (7th Cir. 2011) (explaining that relying on parties' descriptions of highly disturbing evidence of child pornography is insufficient).

### 2. A Bare-Bones Recitation of Rule 403 Is Not Sufficient

In any event, we agree with Eads that the district court needed to provide a more robust explanation of how it balanced the factors under Rule 403 before it admitted the pornographic images and videos. In overruling Eads's objection to the admission of the hard copy images of child pornography, the court made no mention of having examined the evidence or of any effort to weigh its prejudicial impact. The court explained its decision only briefly: "The court is going to overrule your objection. These photographs are relevant to the elements that the government has to prove in this case beyond a reasonable doubt." When Eads objected later at trial to the admission of the video clips, the court similarly stated: "Rule 403 prohibits evidence that is unreasonably prejudicial. The government is going to minimize the prejudice of these exhibits by only playing short clips." These are not sufficient explanations for admitting the contested evidence under Rule 403, as we have cautioned many times that "[a] pro-forma recitation of the Rule 403 balancing test does not allow an appellate court to conduct a proper review of the district court's analysis." *Loughry*, 660 F.3d at 972. "To avoid this trap, a district court should carefully analyze the prejudicial effect [of the evidence], and provide a considered explanation of its reasons for admitting the evidence." *United States v. Miller*, 688 F.3d 322, 328 (7th Cir. 2012) (citing *United States v. Ciesiolka*, 614 F.3d 347, 357 (7th Cir. 2010)) ("A perfunctory analysis or bare-bones conclusion simply will not suffice.").

Whether the probative value of the challenged images and videos was substantially outweighed by the risk of un-

fair prejudice to Eads is a closer call. Eads insists that the videos were only shown to inflame the minds of the jurors and the fact that some of them were crying after the videos were shown demonstrates their prejudicial effect. "Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is *unfair*." *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011) (emphasis added). The government maintains that it may publish portions of charged images of child pornography to a jury, even when a defendant has stipulated that the images contain child pornography and contends that stipulations cannot substitute for the government's chosen evidence. To the extent that a defendant who stipulates to the content of images then argues at trial that he did not know he was in possession of child pornography or did not understand the wrongfulness of receiving these images, we agree.[3] A stipulation about the content of charged images only goes so far if it is silent with respect to the defendant's knowledge of the images in his possession.

---

[3] At least two unpublished decisions from this circuit have suggested that "offers of stipulation are not persuasive in the context of child-pornographic prosecutions" where the defendant's knowledge of possessing the images was disputed. *See United States v. Keith*, 440 Fed. Appx. 503, 507 (7th Cir. 2011) (explaining that "evidence should not be excluded merely because it might be graphic or disturbing" and "the images were probative because they showed Keith's possession of child pornography images and his knowledge of possession such images"); *see also United States v. Hatfield*, 358 Fed. Appx. 692, 694, 696 (7th Cir. 2009) (finding video clips of child pornography not unfairly prejudicial where the defendant tried "to imply that his computer equipment had been compromised by someone who downloaded the child pornography without his knowledge").

This is why showing the images served a valid, non-cumulative, purpose in this case. Recall that even though Eads stipulated that the images contained child pornography, he insisted at trial that he had been unaware of the images on his laptop and that they must have been download-ed by his houseguest, Nathan Asbury. This left the govern-ment with the burden to prove that Eads *knew* he was in possession of child pornography. To accomplish this task, the government proved that the images that were shared online matched up with Eads's email address. For example, one file found on Eads's computer containing an image of child pornography entitled, "Baby White Girl," had accom-panying text stating: "I'm looking to rent a child for sex … . They must be under 10 years old … . I have been with a few kids before … . Please email me at childtopfan@yahoo.com." Clearly, the government showed that the email listed on the image belonged to Eads.

Moreover, we note that all of the images were derived from files charged in the indictment, so it is not as if the im-ages were unrelated to the crime charged or more disturbing than the ones found in his home. *See United States v. Burt*, 495 F.3d 733, 741 (7th Cir. 2007) (finding no unfair prejudice where defendant was prosecuted for exactly what a chal-lenged "chat log depict[ed]: creating, trading, and distrib-uting photos of children for the sexual satisfaction of himself and his online partners"); *cf. Loughry*, 660 F.3d at 974 (find-ing prejudice where disturbing content of videos made de-fendant appear "more despicable to the jury than the 'lasciv-ious pornography'" the defendant was actually charged with distributing). But ultimately, we need not decide whether publishing the contested images and videos to the

jury was error because the evidence at trial clearly estab-lished Eads's guilt beyond a reasonable doubt.

### 3.   Admission of the Images Was Harmless Error

As we have explained before, "[t]he test for harmless er-ror is whether, in the mind of the average juror, the prosecu-tion's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Blanchard*, 542 F.3d 1133, 1151 (7th Cir. 2008) (citation omit-ted). "An error is harmless if the untainted incriminating ev-idence is overwhelming." *Loughry*, 660 F.3d at 975. The evi-dence presented against Eads at trial was quite significant. When detectives turned on his living room laptop computer, the file sharing software used to distribute child pornogra-phy automatically activated with twenty-five videos in the queue for downloading. The file folder containing most of the child pornography was easily accessed through an icon on the desktop of his computer. The image described above offering to "rent" a child for sex was found on the computer. A video showing naked children had been played on the computer just eight hours before the detectives searched the home. Twelve days before that, a video file with the title, "Incest Mom 29 and Kiddy 8/9 year" was played.

The government offered additional evidence connecting Eads to the living room computer and undermining his con-tention that it was used solely by houseguests. The computer name was input as "Chris," the desktop background of the computer was a picture of Eads, and email accounts linked to Eads were created on the computer using the IP address from which Detective Odier downloaded the images charged in Count 1. Furthermore, the evidence showed that Eads used the computer for posting personal ads on

Craiglist with the childtopfan@yahoo.com email address. At
trial, two women who responded to these ads identified
Eads as the individual with whom they met, and one woman
testified that he showed her pictures of his family on the liv-
ing room computer in question. All of the facts above lead us
to conclude that the evidence of Eads's guilt was over-
whelming and the court's admission of the images did not
change the outcome of the trial.[4] Therefore, Eads's challenge
to his convictions on Counts 1 and 2 must fail.

**C. Conviction for Witness Tampering Was Supported
by the Evidence**

Eads also argues that the government failed to present
sufficient evidence to show that he tried to persuade his wife
to commit perjury. When considering a challenge to the suf-
ficiency of the evidence at trial, a defendant faces an uphill
battle on appeal because we must draw "all reasonable in-
ferences in the prosecution's favor" and affirm "if any ra-
tional jury could have found the elements of the crime be-
yond a reasonable doubt." *United States v. Wortman*, 488 F.3d
752, 754 (7th Cir. 2007).

To convict Eads of witness tampering under 18 U.S.C.
§ 1512(b), the government had to prove that: (1) Rachel was
a witness or prospective witness; (2) Eads attempted to per-

---

[4] To the extent that Eads also argues in his pro se brief that his convic-
tions for possession and distributing child pornography were not sup-
ported by the evidence, we must disagree given the extent of evidence
recounted above. "[W]e will overturn a guilty verdict only when the rec-
ord contains no evidence, regardless of how it is weighed, upon which a
rational trier of fact could find guilt beyond a reasonable doubt." *United
States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002).

suade Rachel to provide false testimony, and (3) Eads acted knowingly and with intent to influence Rachel's testimony. *United States v. Holt*, 460 F.3d 934, 938 (7th Cir. 2006) (citing *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005)). The evidence on this charge—solely from Eads's jailhouse conversations with Rachel—is not overwhelming, but it is not so thin that the jury was obliged to acquit Eads of this charge. *See Wortman*, 488 F.3d at 754 ("We do not reverse a conviction if a reasonable jury *could* have acquitted a defendant, we only reverse if the jury was *obliged* to acquit the defendant.") (emphasis added).

To prove this charge at trial, the jury heard eight, fifteen-minute long recordings of phone calls between Eads and Rachel in the days following his arrest. Eads insists that he was only trying to convince Rachel to tell the truth on the calls in question, but our review of their conversations suggests otherwise. When heard in context, the calls evince a clear effort at manipulation, as Eads is heard tearfully pleading with Rachel to recant her previous statements to police and to "think of [their] family before saying anything [else] to the cops." He specifically demands that she "make up some letters" to write to the trial court judge denying that she ever saw him on the living room computer or with a fake FBI badge, and begs her to state that Eads was out of town on October 26, 2011 (the day detectives downloaded the pornography from his computer). For instance, he said:

> Rachel, if you love me, if you've ever loved me, that's the only thing you've gotta do. It's not rocket science, it's not hard. Just have the courage. I mean you had the courage to sit there and say these things, now just take them all back and say you were, you were

scared, they were threatening to take you to jail, you didn't know what you … were saying … . I mean, once you produce … the alibi that we weren't even in f----ing town on the 26th, the 25th or the 26th. We were out of town. You're, I mean you're giving me the f----ing alibi that I wasn't nowhere near the computer.

Eads further instructs his wife to say that Nathan Asbury set him up, and "even if it wasn't Nathan, it's somebody [else]." He promises Rachel that she "can make this right," just as long as she doesn't "say anything more [that is] hurtful."

When heard in context, the tenor of these statements illustrates a clear invitation for Rachel to lie for Eads. Eads points to the fact that he also said to Rachel several times, "you have to tell them the truth" and "I wouldn't be in here if you hadn't told them these things," but our review of the calls leads us to believe these statements were either made with a wink and nod, or Eads was still trying to make Rachel believe his lies. *See LaShay*, 417 F.3d at 718–19 (7th Cir. 2005) (explaining that a defendant may "corruptly persuade" a witness to testify falsely by telling "a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it," or persuading "a witness to give a false account that tracked the defendant's position," in other words, "an unstated invitation to lie"). In any event, the jury was not required to believe Eads's suggestion that he was trying to convince Rachel to tell the truth. *See United States v. Millbrook*, 553 F.3d 1057, 1066 (7th Cir. 2009) (explaining that defendant's "spin on the conversation" between he and a potential witness "may be plausible, but the jury was not required to accept it"), overruled on

other grounds by *United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010) (en banc). Therefore, Eads's challenge to his witness tampering conviction fails.

### D. New Trial Not Warranted Since No Newly Discovered Evidence

In his pro se brief, Eads contends that the district court should have granted his motion for a new trial based on purported newly discovered evidence. In order to receive a new trial based on newly discovered evidence, defendants must demonstrate that the evidence "(1) came to their knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial." *United States v. Ryan*, 213 F.3d 347, 351 (7th Cir. 2000). As the reviewing court, "we approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *Id*. As a result, we review a district court's denial of a motion for a new trial for an abuse of discretion. *United States v. Farmer*, 717 F.3d 559, 564 (7th Cir. 2013).

Eads's scattershot motion contained a list of twenty-four grounds for a new trial. We need not recount all of those claims here; suffice it to say that his evidence was less than convincing. He specifically claimed that his mother, Linda Eads, had alibi information suggesting that Eads was not at home on October 26, 2011. Yet he never explained the nature of this evidence, when he learned of it, or how such evidence would have resulted in an acquittal. As the district court observed, Eads called his mother as a witness at trial but never questioned her about his whereabouts on October 26. More-

over, he presented no affidavits or testimony from his mother that might tend to prove that he was innocent. And at the evidentiary hearing on his motion for a new trial, Eads called Asbury, Rachel, and his father—he did not offer any testimony from his mother. Therefore, we conclude that the district court did not abuse its discretion when it denied Eads's motion for a new trial.

### E.  Discussion of § 3553(a) Factors Was Sufficient

The last matter to address is sentencing. Eads claims that he was improperly sentenced on the witness tampering count because the district court did not sufficiently discuss the factors under 18 U.S.C. § 3553(a) with respect to this charge as distinct from the child pornography charges. We review claims of procedural error at sentencing de novo. *United States v. Schuster*, 706 F.3d 800, 808–09 (7th Cir. 2013).

The district court initially sentenced Eads to serve 240 months on Count 1 (distributing child pornography), 240 months on Count 2 (possessing child pornography) to run consecutively, and a term of 36 months on Count 5 (witness tampering) to run concurrent to Counts 1 and 2. After being advised by the probation officer (off the record) that the maximum possible sentence for possession in Count 2 was 120 months, the district court immediately amended the ruling to reflect this change, but increased the sentence for the witness tampering in Count 5 to 120 months and stated that all three counts would run consecutively. The result was that the total number of months remained at 480 months' imprisonment—ten years below the low-end of the authorized Guidelines range of 50 years' imprisonment.

On appeal, Eads points to 18 U.S.C. § 3584(b), which states that "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section § 3553(a)." Eads contends (without citation to any controlling authority) that the district court should have discussed the § 3553(a) factors specifically with respect to the tampering charge when it sentenced him and when it lengthened his sentence on this charge.

A sentence below the Guidelines range is presumed reasonable, *see United States v. Rosen*, No. 12-2101, __F.3d__, 2013 WL 4081277, at *9 (7th Cir. August 14, 2013), and our review of the sentencing transcript belies any notion of error here. We have said before that "[a] district court need not discuss all of the § 3553(a) factors, but it must give them meaningful consideration." *United States v. Mantanes*, 632 F.3d 372, 374 (7th Cir. 2011). Here, the district court fully discussed the sentencing factors under § 3553(a) over several transcript pages, explaining that it "considered the nature and circumstances of the offense, the defendant's criminal history and characteristics, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to provide an adequate deterrence to criminal conduct of this nature by others who might try to do similar things." *See* 18 U.S.C. § 3553(a). To this end, the court recounted the particularly disturbing nature of the child pornography in question (including the image with text offering to "rent" a child for sex), the testimony at sentencing of at least one woman whom Eads brutally coerced into sexual exploitation at the age of fifteen, Eads's calls to his wife from jail in an effort to manipulate her, and

his "inordinate preoccupation" with law enforcement in light of the evidence that he impersonated police officers on more than one occasion. Though the court did not dwell on the witness tampering charge, the record demonstrates that the sentencing process was fair overall. *See Gall v. United States*, 552 U.S. 38, 50 (2007). As a result, we conclude that the district court clearly articulated the basis for its decision and the sentence was reasonable.

## III. CONCLUSION

For all of the reasons explained above, we AFFIRM Eads's conviction and sentence.