In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1142

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 415 — **Gary Feinerman**, *Judge.*

ARGUED APRIL 14, 2016 — DECIDED AUGUST 15, 2016

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Domingo Blount spearheaded a narcotics-trafficking ring with Defendant Charles Thomas serving as security. Ultimately, law enforcement broke up the ring and charged many of its participants, including Thomas. After a series of disagreements with several attorneys, Thomas represented himself at his trial. He called Blount as a witness in his defense, and Blount denied Thomas's involvement in the conspiracy. Nevertheless, the jury

convicted Thomas of all counts. Thomas appeals, challenging the district court's denial of his request for substitute counsel, the district court's finding that he waived his right to counsel, and the district court's imposition of a 2-level sentencing enhancement for suborning Blount's perjured testimony. We affirm.

## I. BACKGROUND

On June 16, 2011, the government charged Thomas with participating in a large-scale heroin conspiracy orchestrated by Blount. A grand jury returned an indictment against Thomas on September 20, 2011, charging him with conspiring to distribute narcotics in violation of 21 U.S.C. § 846; possessing narcotics with intent to distribute during a drug deal on October 25, 2010, in violation of 21 U.S.C. § 841(a)(1); and using a cellular telephone during the October 25 narcotics deal in violation of 21 U.S.C. § 843(b).

### A. Parade of Counsel

The start of prosecution marked the start of Thomas's protracted difficulties with his lawyers. Shortly after the government filed the criminal complaint, Thomas retained counsel, who filed an appearance. On March 13, 2012, Thomas's first attorney moved to withdraw because of irreconcilable differences between attorney and client. The district court granted the motion to withdraw and appointed a second attorney.

One month later, Thomas's second attorney moved to withdraw after receiving a letter from Thomas indicating that he did not want the attorney representing him any longer. On May 10, 2012, the district court granted the motion to withdraw and appointed a third attorney. But the

third attorney also moved to withdraw one month after her appointment because Thomas told her he did not want her representing him any longer.

On July 12, 2012, the district court held a hearing on the third attorney's motion to withdraw. The district court admonished Thomas that it could not continue to appoint attorneys indefinitely, but that it would grant the motion and appoint a fourth attorney. Thomas expressed misgivings about being appointed a fourth attorney, stating: "If they're not going to help me, I'm better off going pro se then." (Tr. 8, July 12, 2012.) The district court encouraged Thomas to either give the fourth attorney a chance or retain counsel.

Thomas agreed to let the fourth attorney ("Attorney 4") represent him, and the district court appointed Attorney 4. Thomas, however, was not satisfied for long. On August 24, 2012, Attorney 4 moved to withdraw, claiming that Thomas did not want his representation.

At a hearing on September 13, 2012, Thomas complained that Attorney 4 was "not even looking into" issues Thomas had raised. (Tr. 4, Sept. 13, 2012.) The district court ordered Thomas to write a list of concerns and discuss it with his attorney, and it postponed ruling on the motion to withdraw. The district court said that it would not allow Thomas to "cycle through lawyers" and that it would not appoint another attorney. (*Id.* at 13–14.) Attorney 4's motion to withdraw was withdrawn on October 17, 2012, after Thomas indicated that they had resolved their differences.

That is until November 15, 2012, when Thomas again expressed that he was having a conflict with Attorney 4 over the propriety of filing a motion to dismiss the indictment.

Thomas requested that the district court appoint him new counsel. The district court refused, finding that Attorney 4 was "providing [Thomas] with adequate and sufficient and able representation." (Tr. 11, Nov. 15, 2012.) The district court gave Thomas the choice to either continue with Attorney 4 or proceed pro se. Thomas refused both choices, prompting the district court to order that Attorney 4 would continue representation.

The case proceeded without issue until August 1, 2013, when Thomas filed two pro se affidavits arguing that there were factual errors in the complaint against him. Attorney 4 moved to strike the affidavits, arguing that the court should not consider pro se filings from a represented party and that the issues raised should be addressed at trial. After discussing the motion at a hearing in which counsel and the district court explained to Thomas why the issues he raised had to be explored at trial, Thomas said, "I don't want him as my attorney." (Tr. 6, Aug. 28, 2013.) The district court responded that Attorney 4 had not engaged in any behavior that would justify removing him as counsel, and therefore, Thomas could either keep Attorney 4 or represent himself. Thomas chose to represent himself, and the district court set a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975).

*B. First* Faretta *Hearing*

The district court held its first *Faretta* hearing on September 6, 2013. Thomas indicated that he did not want to represent himself but that he wanted "[t]o get another attorney." (Tr. 2, Sept. 6, 2013.) The district court reiterated that it had "been given no good reason why [Thomas was] dissatisfied with appointed counsel." (*Id.* at 4.) The district court presented Thomas with three choices: keep appointed counsel,

retain his own counsel, or represent himself. Thomas said "No" to all three. (*Id.* at 5.)

The district court, relying on our opinion in *United States v. Oreye*, 263 F.3d 669 (7th Cir. 2001), deemed Thomas to have chosen to represent himself through his rejection of either keeping his appointed counsel or retaining his own lawyer. The district court then instructed Thomas that through his actions he was invoking his right to self-representation and waiving his right to appointed counsel. After going through the *Faretta* inquiry and advising Thomas that it was "unwise" to represent himself, the district court asked for the final time whether Thomas would "like to continue to be represented by [Attorney 4]." (*Id.* at 16.) Thomas said, "Yes," and withdrew his request to represent himself. (*Id.*)

*C. Second* Faretta *Hearing*

Thomas kept Attorney 4, and the case was set for trial on December 2, 2013. But on November 25, 2013, coconspirator Domingo Blount pled guilty to all counts. Blount refused to implicate Thomas in his plea agreement, leading Thomas's counsel to file a motion to continue Thomas's trial in order to make Blount available to testify on Thomas's behalf.

The trial was postponed, but Thomas's disagreement with Attorney 4 was not. On March 4, 2014, Thomas filed a pro se "Motion for Attorney to Withdraw." Thomas complained that his lawyer had not given him grand-jury transcripts, intercepted phone transcripts, cooperators' proffer interviews, and Rule 3500 materials.

At a hearing on March 17, 2014, Attorney 4 explained that he tried to meet with Thomas but that Thomas refused to see him or respond to his emails. With respect to discov-

ery materials, counsel indicated that they had either not been turned over from the government yet or that Thomas had already been provided with the material.[1] When asked whether there was "any other basis … that [Thomas] ha[d] for wanting to part ways with [Attorney 4]," Thomas replied: "I just don't trust him, period. I don't believe nothing he say." (Tr. 14–15, Mar. 17, 2014.) Finding no grounds to excuse Attorney 4, the district court again explained Thomas's options. Thomas responded: "That's why I want to file a motion to proceed *pro se*." (*Id.* at 16.) Thomas hesitated, however, and it was resolved that *if* Thomas decided to proceed pro se, he would file a motion with the court.

No such motion was filed. Five days prior to the scheduled trial date, on May 7, 2014, the district court held a pretrial conference. Thomas interjected that he had written a letter to the district court indicating that he "would go *pro se*." (Tr. 10, May 7, 2014.) The district court followed up, asking "are you saying that you would like to represent yourself at trial?" to which Thomas replied, "Yes." (*Id.* at 11.)

The district court then conducted a second *Faretta* hearing, informing Thomas that he was invoking his right to self-representation and waiving his right to appointed counsel. The district judge then asked a series of questions. Thomas stated that he had not studied law or represented himself

---

[1] The district court imposed a protective order on coconspirator proffers, requiring that the documents not be kept in the Metropolitan Correctional Center in order to protect the safety of cooperators. The government did not produce: (1) grand-jury transcripts of non-testifying witnesses because Thomas is not entitled to them without showing particularized need and (2) finalized intercepted call transcripts because they were not yet final.

before, but that he had an eleventh grade education, had watched two criminal trials, understood the charges and potential penalties, and understood that the rules of procedure and evidence applied. Finally, the district judge advised Thomas that "it is highly likely that a trained lawyer would defend you better than you could defend yourself. I, therefore, think it is unwise of you to try and represent yourself." (*Id.* at 22.) Thomas nonetheless chose to represent himself, and the district court found that Thomas waived counsel knowingly and voluntarily.

*D. Jury Trial*

Thomas's case proceeded to trial. He represented himself, but he was appointed standby counsel. The government presented the testimony of fourteen witnesses and the recordings from seventy-three phone conversations.

In particular, the government presented testimony from coconspirator Gabriel Bridges who testified that Thomas served as security for Blount's drug deals. Bridges testified to specific drug deals on October 20, November 1, and November 6, 2010, at a home on Karlov Avenue ("Karlov house") for which Thomas provided security. The government also presented testimony from law enforcement officers who conducted surveillance at the Karlov house. The officers identified Thomas as driving Blount's white Lincoln in the area of the Karlov house on October 20 and November 6. On November 1, 2010, an officer observed Thomas enter the Karlov house and then exit it after receiving a call from Blount that said "We gotta go."

On October 25, 2010, an officer observed Blount's Lincoln in the area of the Karlov house. The government published

an intercepted telephone call between Blount and Thomas from October 25 in which Thomas indicated that he had passed Armitage and Karlov but that he was on his way. Shortly thereafter, an officer observed the white Lincoln pull into the area. A few minutes later, Thomas called Blount to warn of suspected law enforcement parked near the house.

Thomas called a single witness in his defense—Blount. Blount testified that he had known Thomas for thirty years. Blount admitted that he was at the Karlov house on October 20 and 25 and November 1 and 6, 2010. But, he testified that he did not recall Thomas being there on those dates and that Thomas did not act as security for him on any of those days. When cross-examined, Blount continued to deny that Thomas was in the vicinity of the drug deals and that Thomas had "never went" to the Karlov house. (Trial Tr. 966.) On redirect, Thomas asked Blount whether on November 1, 2010, "did Charles Thomas enter [the Karlov house]?" (*Id.* at 1011.) Blount replied "Never." (*Id.*)

The jury convicted Thomas of all counts.

*E. Sentencing*

Thomas's sentencing began on January 5, 2015, with Thomas's standby counsel representing him in post-trial proceedings. The government argued that Thomas should be subject to a 2-level obstruction-of-justice enhancement for suborning Blount's perjured testimony. U.S.S.G. § 3C1.1.

The district court imposed the enhancement, discussing its reasoning at length:

> Blount's testimony, his direct testimony was false. He testified that Mr. Thomas was not at the drug deals, that he wasn't driving the white Lincoln, and

that was plainly false, as proven by the audi-
otapes … .

That testimony was material, because if the jury be-
lieved Mr. Domingo Blount's direct testimony, it
would have acquitted Mr. Thomas, at least in part
and perhaps in whole. …

And based on the circumstances, I'm going to find
that Mr. Thomas knew what Mr. Domingo Blount
was going to say. As I mentioned, I had arranged, I
believe at Mr. Thomas's request, to have Mr. Blount
transferred to the MCC in sufficient enough time to
allow Mr. Thomas to meet with Mr. Blount to pre-
pare for trial.

So, I think it was clear that Mr. Thomas—when Mr.
Thomas put Mr. Domingo Blount on the stand, …
he knew what Mr. Blount was going to say and he
knew what the truth was, he knew that Mr. Blount
was going to give false testimony.

(Sent. Tr. 15–16, Jan. 5, 2015.)

After the district court's imposition of the enhancement,
Thomas faced a guidelines range of 262 to 324 months' im-
prisonment. The district court imposed a within-guidelines
sentence of 262 months.

## II. ANALYSIS

On appeal, Thomas challenges three of the district court's
rulings. First, he argues that the district court abused its dis-
cretion by refusing to appoint him a fifth attorney. Second,
he argues that it erred in finding that he waived his right to
counsel. Third, he argues that the district court erred in im-
posing the 2-level enhancement for obstruction of justice.
Finding no error, we reject Thomas's claims.

*A. Denial of Request for Substitute Appointed Counsel*

When a defendant has been given the opportunity to explain the reasons for seeking appointment of a new attorney, we review the district court's decision to deny that request for an abuse of discretion. *United States v. Harris*, 394 F.3d 543, 551 (7th Cir. 2005). The district court held a hearing on Thomas's motion requesting substitute counsel and allowed Thomas to explain his reasons for wanting Attorney 4 removed. Therefore, we review the denial of substitute counsel for an abuse of discretion.

In reviewing whether the district court abused its discretion in denying a request for substitute counsel, "we consider the following three nonexhaustive factors: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's motion; [and] (3) whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Bjorkman*, 270 F.3d 482, 500 (7th Cir. 2001). Evaluation of these factors shows that there was no abuse of discretion in denying Thomas's request.

We need not dwell on the timeliness of Thomas's motion. Although it was made on the eve of trial, the district court was aware of the possibility of such a motion, and it does not appear to have been an attempt to delay the proceedings. Rather, Thomas had seemingly good-faith (albeit mistaken) concerns about the representation Attorney 4 provided.

Thus, we turn to the second factor—the adequacy of the district court's inquiry. Over the course of Thomas's case, the district court held several hearings due to Thomas's repeated problems with his lawyers. The district court's final inquiry

into Thomas's concerns with Attorney 4 was extensive. The district court discussed one-by-one each item of discovery that Thomas claimed Attorney 4 had not provided to ensure that Thomas was kept updated. Yet Thomas remained unsatisfied. After the district court resolved the disputes over discovery, Thomas's final complaint was that he "just don't trust [Attorney 4]." Thomas does not argue on appeal that there were any grounds for Thomas's distrust beyond those the district court discussed.[2] Because Thomas was able to express his dissatisfaction—aided in no small part by the comprehensive questioning from the district court—we find that the district court made an adequate inquiry regarding Thomas's request for substitute counsel.

With respect to "whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense," *Bjorkman*, 270 F.3d at 500, our inquiry is made difficult in light of the fact that it was *Thomas* who refused to cooperate with Attorney 4. Instead, we have said

> where the defendant's lack of counsel was caused by his own refusal to cooperate with the counsel appointed for him and where the defendant was made aware of the possible consequences of his refusal to cooperate, the district court's decision not to appoint new counsel for the defendant does not constitute an abuse of discretion.

---

[2] Instead, Thomas argues on appeal that it was the district court's protective order and the government's refusal to provide discovery that *created* the conflict between Thomas and his attorney. There are no grounds in the record upon which to conclude that the government and the district court manufactured an attorney-client conflict, and we swiftly reject such an implication.

*United States v. Irorere*, 228 F.3d 816, 828 (7th Cir. 2000). Like the defendant in *Irorere*, Thomas went through several attorneys and admitted that he refused to see Attorney 4 in prison. It was his own refusal to meet or cooperate with Attorney 4 that precipitated the district court's denial of his request for substitute counsel. That denial was no abuse of discretion.

*B. Waiver of Counsel*

The necessary consequence of a district court's denial of a request to substitute counsel is that the defendant must choose whether to (1) continue with appointed counsel, (2) retain counsel, or (3) proceed pro se. A district court has discretion to give such an ultimatum where it finds that the defendant has "waive[d] his right to counsel through his own contumacious conduct," which the court did in this case. *Id.* at 826; *see also United States v. Alden*, 527 F.3d 653, 660–61 (7th Cir. 2008); *Oreye*, 263 F.3d at 670–71.

There is some uncertainty about the standard of review we apply where the district court finds that the defendant waived counsel:

> We have recently said we review a defendant's waiver of his right to counsel for an abuse of discretion. *See, e.g.*, *United States v. Eads*, 729 F.3d 769, 775 (7th Cir. 2013). However, as [the defendant] points out, there is also a line of cases in this circuit, which has not been overruled, stating we review these decisions *de novo*. *See, e.g.*, *United States v. James*, 487 F.3d 518, 527 (7th Cir. 2007); *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir. 2001).

*United States v. Clark*, 774 F.3d 1108, 1112 (7th Cir. 2014). Be-cause there was no error in Thomas's case under either standard, we decline to resolve the discrepancy.

A defendant must waive his right to counsel knowingly and intelligently. *See Alden*, 527 F.3d at 660. A knowing and intelligent waiver, however, need not be explicit. "[S]o long as the district court has given a defendant sufficient oppor-tunity to retain the assistance of appointed counsel, defend-ant's actions which have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice." *Id.* (alteration in original and internal quotation marks omitted).

In evaluating whether the defendant made a knowing and intelligent waiver of counsel, we consider:

> (1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself; (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the defendant's background and experience; and (4) the context of the defendant's decision to waive his right to counsel.

*Id.*

The district court conducted a thorough formal inquiry into Thomas's waiver of counsel in accordance with *Faretta*, 422 U.S. 806. In fact, over the course of Thomas's criminal case, the district court conducted *two* formal *Faretta* hearings. At the hearings (and on many more occasions), the district court warned Thomas of the danger of refusing counsel and choosing to represent himself, and Thomas acknowledged that he understood. The district court questioned Thomas

about his education, background, understanding of the law, and his understanding of the charges and possible penalties. Thomas indicated that he had attended school until eleventh grade, had watched two criminal trials, understood the charges and potential penalties, and understood the applicability of the rules of procedure and evidence. Thomas acknowledged that he was voluntarily deciding to represent himself.

The district court's finding that Thomas knowingly and intelligently waived his right to counsel is amply supported by the record. Thomas's argument on appeal that the district court "forced" him to waive his right to counsel is unsubstantiated. As held above, the district court's denial of Thomas's request for substitute counsel was not an abuse of discretion, and Thomas voluntarily, knowingly, and intelligently chose to proceed pro se.

*C. Obstruction-of-Justice Enhancement*

Thomas's final challenge on appeal is to the district court's imposition of a 2-level obstruction-of-justice enhancement, which the district court imposed because Thomas suborned the perjured testimony of Domingo Blount.

"We review the [district] court's factual findings supporting the obstruction of justice enhancement for clear error. … We review *de novo*, however, whether those findings adequately support the application of the enhancement." *United States v. DeLeon*, 603 F.3d 397, 402 (7th Cir. 2010) (citations omitted).

The district court may apply the obstruction-of-justice enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the admin-

istration of justice … and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The enhancement applies in situations where the defendant "commit[s], suborn[s], or attempt[s] to suborn perjury." § 3C1.1 n.4(B). To find that the defendant suborned perjured testimony, there must be evidence that (1) the witness willfully provided false testimony, *United States v. Pabey*, 664 F.3d 1084, 1095 (7th Cir. 2011); (2) the false testimony is material, *id.*; and (3) the defendant "aided or abetted, counseled, commanded, induced, procured, or willfully caused" the perjury, U.S.S.G. § 3C1.1 n.9.

The district court's finding that Blount's testimony was false, and not the product of faulty memory, is not clearly erroneous. Blount testified that Thomas never served as his security and never entered the Karlov house. To the contrary, several officers who conducted surveillance testified that they saw Thomas outside the Karlov house on October 20 and 25, 2010, as well as November 1 and 6, 2010. On November 1, officers observed Thomas enter the Karlov house. Coconspirator Bridges testified that Thomas served as security for Blount. The government also presented phone calls between Thomas and Blount. In particular, a call made on October 25 recorded a conversation in which Thomas told Blount that he had driven too far past the Karlov house, but that he was on his way.

Given the testimony presented at trial from law enforcement, intercepted telephone calls, and coconspirator Bridges's testimony, which established that Thomas *was* at the drug deals, the district court did not commit clear error in finding that Blount gave false testimony by testifying that Thomas never went to the Karlov house nor provided securi-

ty. Nor did the district court clearly err in finding that Blount's testimony was not the result of a "faulty memory" about drug deals occurring five years earlier. Instead, Blount affirmatively denied that Thomas participated in drug deals at the Karlov house, even in the face of surveillance and phone call evidence.

Blount's testimony was also material. If Blount's version of events—that Thomas never served as Blount's security and never went to the Karlov house—were believed, it would likely influence the jury. At issue in the trial was whether Thomas was present and served as security for Blount during drug deals at the Karlov house. Blount's testimony, if believed, would negate Thomas's participation in the drug deals at issue. The fact that the government ably cross-examined Blount, and that Blount's testimony likely harmed rather than helped Thomas, is of no moment. *See United States v. Grigsby*, 692 F.3d 778, 785–86 (7th Cir. 2012) ("A false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the [jury.] The statement need not *actually* affect the decision. … [The defendant's] lie didn't fool anyone, but that doesn't make it immaterial." (first alteration in original) (citations and internal quotation marks omitted)).

Finally, the district court did not clearly err in finding that Thomas "suborned" Blount's perjured testimony. There need not be evidence that Thomas instructed Blount to testify falsely; rather, there need only be sufficient evidence to conclude that Thomas used Blount in his defense knowing that Blount would testify falsely. *See Pabey*, 664 F.3d at 1095 ("Even if [the defendant] did not actually ask or pressure [the witness] to falsely testify, … he used [his] testimony as

his main defense knowing that it was not true, which amounts to suborning perjury.").

The district court arranged for Blount to be housed near Thomas in custody so he and Thomas could prepare for trial. Thomas acknowledged to the court that he was in fact able to speak with Blount, who testified he had known Thomas for thirty years. In addition, Thomas knew that Blount had refused to implicate him in the conspiracy during his plea hearing. The evidence clearly demonstrates that Thomas offered Blount's testimony even after he knew Blount would falsely testify regarding Thomas's role (or rather, lack thereof) in the drug transactions. Therefore, the district court did not clearly err in finding that Thomas suborned perjured testimony.

Thomas also argues that the enhancement violates his Sixth Amendment right to present a defense. Undoubtedly the enhancement is not "intended to punish a defendant for the exercise of a constitutional right," U.S.S.G. § 3C1.1 n.2, but there is no constitutional right to present perjured testimony. *United States v. Lowder*, 148 F.3d 548, 553 (5th Cir. 1998) ("[A defendant's] right to present witnesses in his own defense does not encompass a right to suborn perjury."); *see also United States v. Dunnigan*, 507 U.S. 87, 96 (1993) ("[A] defendant's right to testify does not include a right to commit perjury.").

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Thomas's conviction and sentence.