In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 17-1708

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS C. BALSIGER,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:07-cr-57 — **Charles N. Clevert, Jr.,** *Judge.*

---

ARGUED SEPTEMBER 5, 2018 — DECIDED DECEMBER 10, 2018

---

Before EASTERBROOK, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* For his role in designing and implementing a scheme to defraud manufacturers that issue coupons for consumer products, a grand jury charged El Paso businessman Thomas Balsiger with 25 counts of wire fraud and conspiracy both to commit wire fraud and obstruct justice. A decade of litigation followed, culminating in a bench trial at which Balsiger represented himself with the assistance

of stand-by counsel. The district court convicted Balsiger on 12 counts and sentenced him to 120 months' imprisonment.

On appeal Balsiger argues the district court deprived him of his Sixth Amendment right to retain the counsel of his choice by failing to grant an 18-month continuance and by refusing to order the government to remove a so-called *lis pendens* on his home—a notice to potential buyers that title to the property might be impaired by the outcome of his criminal prosecution. He also contends the district court erred when, following the death of his attorney, it concluded he waived his right to counsel and required him, over his objection, to proceed *pro se*. Finally, Balsiger challenges the sufficiency of the evidence, venue, and several of the district court's sentencing determinations. With the limited exception of the district court's calculation of forfeiture, we affirm.

**I**

In 2000 Thomas Balsiger took the helm of International Outsourcing Services or IOS, one of the nation's largest coupon processing companies. When a consumer uses a coupon at a supermarket, the retailer becomes entitled to reimbursement from the manufacturer. IOS served as an intermediary in this process. It contracted with retailers, including large retail chains as well as small, independently owned stores (known as Rapid Pay clients), to collect and sort coupons redeemed at the retailers' stores and then to submit invoices for reimbursement either directly to the manufacturer or indirectly to the manufacturer's agent. During the period at issue, the two main agents for manufacturers were NCH Promotional Services and Carolina Manufacturer's Services.

While manufacturers reimbursed nearly all coupons invoiced on behalf of IOS's large retail clients, they typically rejected more than 60% of coupons submitted on behalf of smaller, Rapid Pay clients due to fraud concerns. Seeking to maximize reimbursements, Balsiger developed a scheme to deceive manufacturers by falsely invoicing Rapid Pay coupons as if they had been redeemed at IOS's larger retail clients. This ploy—known within IOS as "alternative invoicing"—included invoicing unused coupons as if shoppers had legitimately redeemed them. To avoid detection, Balsiger directed employees at IOS's plants in Mexico to make new coupons look as if they had been used by causing them to become wrinkled and tattered.

Despite efforts to conceal the scheme, in March 2007, IOS, Balsiger, and ten other defendants were indicted for wire fraud. A superseding indictment alleged losses to manufacturers exceeding $250 million and detailed Balsiger's efforts to thwart the investigation into IOS's invoicing practices by, for example, destroying records and coaching employees to lie to authorities.

Ten years of litigation followed. Balsiger's retained counsel died in July 2014. The district court conducted multiple hearings over several months to address Balsiger's representation, ultimately concluding that he waived his right to counsel by repeatedly refusing to retain an attorney despite having the means to do so. While each of Balsiger's co-defendants either had their cases dismissed or pleaded guilty, Balsiger proceeded to trial in the fall of 2016. He represented himself during a five-week bench trial, at which the court heard testimony from 32 witnesses, including nine IOS employees who identified Balsiger as the mastermind behind

the fraudulent scheme to deceive manufacturers. The court also heard testimony from manufacturers impacted by Balsiger's scheme. For his part, Balsiger admitted diverting coupons from smaller stores and invoicing them as if they had been redeemed at IOS's larger retail clients, but insisted this practice was limited to manufacturers represented by NCH Promotional Services (counts 1–15) and was permissible under IOS's contract with NCH.

On December 5, 2016—ten years to the day of the original indictment—the district court rendered its verdict. The court found Balsiger not guilty of the wire fraud alleged in counts 1–15, involving NCH clients, and guilty of counts 16–25, involving Carolina Manufacturer's Services clients. The court also convicted Balsiger of conspiracy to not only commit wire fraud but also obstruct justice. The court sentenced Balsiger to 120 months' imprisonment, ordered restitution of $65 million and entered a forfeiture judgment totaling $21.2 million.

## II

### A

On appeal Balsiger raises several Sixth Amendment claims. He first argues that the district court, in the wake of his counsel's death, violated his right to hire his new counsel of choice by denying him an 18-month continuance to accommodate his desired attorney and refusing to order the government to release the *lis pendens* on his residence so he could sell his home and use the funds to retain counsel. He also contends the district court violated the Sixth Amendment by requiring him to represent himself even though he stated he was not waiving his right to counsel, and further, by failing

to warn him of the dangers of self-representation. In short, Balsiger argues that he did not voluntarily waive his right to counsel and any deemed waiver was neither knowing nor intelligent.

We begin with the facts surrounding Balsiger's representation. In 2007 Balsiger retained Joseph Abraham, Jr. as his counsel. Abraham represented Balsiger until his death on July 4, 2014. More than a month later, on August 20, 2014, the district court received notice of Abraham's death and assurances that Balsiger was "diligently searching to find a qualified replacement," and expected to retain new counsel within 30 days. Yet, during a scheduling conference on December 10, 2014—more than five months after Abraham's death—the court learned Balsiger had not retained counsel and purportedly could not afford to do so for 120 days. The court set trial for October 26, 2015.

A few weeks later, during a status conference on January 6, 2015, Balsiger said he planned to retain El Paso-based attorney Richard Esper, but noted he did not believe Esper's schedule would permit him to try the case in October 2015. Balsiger requested until April 1, 2015, to secure the money necessary to retain Esper, explaining he paid his former attorney a significant retainer but had yet to receive a refund. He also argued the government made obtaining the funds necessary to retain new counsel all but impossible by filing a *lis pendens* on his home.

The district court denied Balsiger's request for a continuance until April 1, 2015, to hire Esper, emphasizing the uncertainties surrounding Esper's schedule and the impact of the delay on Balsiger's remaining co-defendants. In doing so, the court underscored the importance of Balsiger retaining an

attorney who would be available to try the case as scheduled. Balsiger responded by asking the court to order the government to lift the *lis pendens* on his home. The court did not rule on this request, instead directing Balsiger to provide additional financial information showing that, absent a lifting of the *lis pendens*, he could not afford counsel.

On January 27, 2015, after reviewing Balsiger's financial information and learning that Esper could not be ready for trial until 2017, the district court issued an order requiring Balsiger to retain substitute counsel by February 17, 2015. The order emphasized Balsiger's lack of diligence in retaining replacement counsel despite having the resources to do so and warned Balsiger that his failure to comply may be deemed a waiver of his right to counsel. The following day, during a status hearing, the court again stressed that Balsiger should be represented by counsel. When Balsiger reiterated his desire to retain Esper, the court carefully weighed his arguments against competing concerns, explaining:

> You are not being denied counsel of your choice generally. You're merely being denied your choice of Mr. Esper in particular because he has made it crystal clear, and through you, that he cannot devote to this case the necessary time in order to prepare for trial in October; and he has indicated that he would not be able to proceed to trial until 2017.
>
> ***
>
> So only a specific attorney will not be allowed to represent you in this case in light of his indication that he cannot be available within the time

frame necessary for this case to proceed with greater dispatch.

Balsiger objected by requesting a continuance until 2017 and again asking the district court to lift the *lis pendens*. The court denied the latter request, finding anew that Balsiger had sufficient income and assets to retain another attorney.

On March 4, 2015—a full eight months after his counsel's death—Balsiger attended another status conference. Seeing that Balsiger remained unrepresented despite the court's order to retain counsel by February 17, 2015, the district court reiterated its desire that he retain counsel: "The first step with regard to pursing your objectives in this case, Mr. Balsiger, and that is, defending against the government's charges, is getting an attorney." The court also found that Balsiger's decision to restrict his search for new counsel to the El Paso area reflected a lack of a genuine effort to secure counsel. The court nonetheless expressed its willingness to accommodate new counsel, explaining it would "entertain appropriate motions and appropriate claims that may be raised by [his] lawyer" and the court offered assurances that it "[was] not taking any issues off the table" with regard to Balsiger's representation.

Finally, the court underscored its concern that Balsiger was engaging in intentional delay and attempting to manufacture a Sixth Amendment claim. The court emphasized that, because Balsiger had the means to retain an attorney, his ongoing failure to do so would be construed as a waiver. On this score—the consequences of Balsiger's continued noncompliance—the court left no ambiguity: "If an attorney has not appeared on your behalf in one week, this case will go forward and you will be called upon to argue any issue that you wish

to raise with respect to your defense. And this case will thereafter proceed to trial with you acting *pro se*."

Balsiger responded by maintaining that he was not waiving his right to counsel and contending that the court was engaged in "clear cut coercion." He also expressed his belief that he would be better off appealing as quickly as possible: "[T]his is a clear-cut case of coercion. Let's proceed and let's just go ahead and get this to the Seventh [Circuit] as quick as we can." Balsiger likewise made plain his unwillingness to comport with the court's deadline: "There will not be an attorney by one week because you will not release the *lis pendens*. You have put restrictions on me that make it impossible. Everyone knows it … So let's proceed with it."

Based on Balsiger's course of conduct, including his statement that he had no intention of retaining a new attorney, the district court concluded Balsiger waived his right to counsel. The court then designated standby counsel to assist Balsiger at trial.

The district court returned to the issue of Balsiger's representation at a pre-trial hearing in May 2015, observing that aside from standby counsel, no attorney had filed a notice of appearance in the case, despite encouragement from the court that Balsiger retain counsel. Given the amount of time that had passed since the death of Balsiger's counsel, the court reiterated that the case needed to move forward: "[T]his matter has to proceed. And if that means Mr. Balsiger will have to present his defense with the help of standby counsel or with the help of a new attorney who might be retained, Mr. Balsiger should be given every opportunity to protect his constitutional rights."

Balsiger persisted in his prior course, explaining that as a "businessman," hiring counsel did not make financial sense and he would rather "play the odds" and not jeopardize any appeal.

B

Balsiger contends he was denied his Sixth Amendment right to retain the counsel of his choice because the district court refused to continue the case for 18 months to accommodate his counsel of choice, Richard Esper. Because "trial courts have broad discretion to grant or deny a request for a continuance to substitute new counsel," our review of the district court's decision is highly deferential. *United States v. Sellers*, 645 F.3d 830, 834 (7th Cir. 2011).

For a defendant who does not require appointed counsel, the Sixth Amendment guarantees the right "to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). Defendants must be afforded a fair opportunity to secure the counsel of their choice, but this right is not absolute. *Sellers*, 645 F.3d at 834. While a court may not "arbitrarily or unreasonably deny a defendant the right to retain chosen counsel," it is well-established that a trial judge "retains wide latitude to balance the right to choice of counsel against the needs of fairness to the litigants and against the demands of its calendar." *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 152). Indeed, "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *United States v. Carrera*, 259 F.3d 818, 825 (7th Cir. 2001) (citing *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)). To make this determination, we consider the circumstances of the ruling and the

reasons articulated by the district court. See *United States v. Santos*, 201 F.3d 953, 958 (7th Cir. 2000).

At the time Balsiger requested the continuance, his case had been pending for more than seven years, and his remaining co-defendants had asserted speedy trial claims. While the district court left open the possibility of granting a shorter continuance if Balsiger ever retained counsel, his preferred attorney, Richard Esper, never appeared to request a continuance—"a significant factor weighing against granting a continuance." *United States v. Sinclair*, 770 F.3d 1148, 1156 (7th Cir. 2014).

We are not confronted with a situation where the district court failed to understand Balsiger's right to retain the counsel of his choice. See *United States v. Smith*, 618 F.3d 657, 666 (7th Cir. 2010). Quite the opposite: the district court conducted multiple hearings to address Balsiger's representation and desire to retain Esper to represent him. After weighing Balsiger's arguments against competing concerns, the court explained that, in reaching its decision, it considered the rights of the other parties involved, including Balsiger's co-defendants who wished to proceed to trial. The court observed that the government, too, had the right to proceed to trial without further delay. While expressing a preference to proceed on the scheduled trial date, the court further noted that if a lawyer filed a notice of appearance, it would consider a motion for a shorter continuance. *Cf. Sellers*, 645 F.3d at 835 (explaining that "a [trial judge's] myopic insistence on proceeding with a scheduled trial date in the face of a valid request for a continuance is arbitrary and unreasonable").

The district court's decision to deny the continuance was neither unreasonable nor arbitrary. The court gave Balsiger

ample time and opportunity to retain Esper or make a specific showing of why he needed more time to recruit and hire a different attorney. The court conducted four hearings and issued multiple orders to address Balsiger's representation and his desire to retain Esper. And the court weighed the pertinent factors and articulated valid reasons for denying the request, including the co-defendants' speedy trial claims and the government's interest in moving the case forward. The denial of the 18-month continuance did not violate the Sixth Amendment.

Pointing to *Luis v. United States*, 136 S. Ct. 1083 (2016), Balsiger further contends that the district court violated his Sixth Amendment right to choice of counsel by declining to remove the *lis pendens* on his home. In *Luis*, the Supreme Court held that the "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 1088. The holding gives effect to the precept that the Sixth Amendment protects the right of a criminal defendant to use "innocent property to pay a reasonable fee for the assistance of counsel." *Id*. at 1096. Balsiger argues that his home was an untainted asset, and to retain the counsel of his choice by the court's initial February 17, 2015 deadline, he needed to sell or mortgage the home, which could only happen with the removal of the *lis pendens*. Based upon our own fresh look at the record, we cannot agree.

The parties do not dispute Balsiger's home was an untainted asset. Yet the government contends that Balsiger's home was not restrained within the meaning of *Luis* because a *lis pendens* is not a lien and does not reflect any sort of seizure, but rather is only a notice that the government has claimed an interest in a property.

While we cannot foreclose a circumstance where a *lis pendens* operates to infringe on a defendant's right to choice of counsel, that is not the case here. The record shows that Balsiger sold his home for $1.5 million in February 2016—a full eight months before his trial began. This fact belies Balsiger's suggestion that the *lis pendens* presented a barrier to selling his home and retaining an attorney. While it may be true that the *lis pendens* delayed this process, the district court repeatedly left open the possibility for Balsiger to retain counsel at any point. And though his trial initially started on February 22, 2016, a day later it was reset to October 2016. In light of this timeline, it is unclear why, once he sold his home, Balsiger failed to alert the court or use the proceeds to retain an attorney. He had access to these and other significant assets eight months before his trial started. On these facts, the district court did not violate Balsiger's Sixth Amendment rights by denying his request to order the government to lift the *lis pendens.*

C

Balsiger's next and most substantial claim is that the district court violated his Sixth Amendment right to counsel by forcing him to proceed *pro se.* He challenges the district court's conclusion that he waived his right to counsel by failing to retain replacement counsel, while arguing further that any deemed waiver was neither knowing nor voluntary.

The parties disagree on the appropriate standard for reviewing a district court's finding of a waiver of the right to counsel. Balsiger invites *de novo* review, while the government urges abuse of discretion review. These competing perspectives mirror the differences in some of our prior cases. On occasion we have reviewed a district court's finding of waiver

for abuse of discretion. See *United States v. Eads*, 729 F.3d 769, 775 (7th Cir. 2013); *United States v. Todd*, 424 F.3d 525, 530 (7th Cir. 2005). Other times we have conducted *de novo* review. See *United States v. James*, 487 F.3d 518, 527 (7th Cir. 2007); *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir. 2001). We have previously recognized but declined to resolve this discrepancy. See *United States v. Thomas*, 833 F.3d 785, 792 (7th Cir. 2016); *United States v. Clark*, 774 F.3d 1108, 1112 (7th Cir. 2014).

We take this opportunity to select a unifying course going forward. And before issuing this opinion, we circulated it to the full court under Circuit Rule 40(e). No judge in active service requested to hear this case *en banc*.

As a general matter constitutional issues receive *de novo* review. See *United States v. Jones*, 844 F.3d 636, 639 (7th Cir. 2016). The Supreme Court reinforced this principle just last term, explaining that the role of appellate courts in the constitutional realm "favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 n.4 (2018).

Whether a defendant comported himself in a manner that amounted to a waiver of his Sixth Amendment right to counsel is a mixed question entitled to *de novo* review. All other circuits to have considered this question have likewise endorsed *de novo* review, oftentimes without much discussion beyond observing that the question presented is of a constitutional dimension. See *United States v. Turner*, 897 F.3d 1084, 1102 (9th Cir. 2018); *United States v. Mesquiti*, 854 F.3d 267, 271 (5th Cir. 2017); *United States v. Conklin*, 835 F.3d 800, 801–02 (8th Cir. 2016); *United States v. Kosow*, 400 F. App'x 698, 700 (3d Cir. 2010); *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir.

2008); *United States v. Owen*, 407 F.3d 222, 225 (4th Cir. 2005); *United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999).

Observing that the constitutional question presented here receives *de novo* review too simplifies the proper analysis. Answering whether a defendant has engaged in conduct that amounts to a waiver of his right to counsel often requires assessments of the defendant's candor, credibility, and resolve to pursue a certain course of action—assessments that benefit from the district judge having a front-row seat.

No better example than this case. The district court concluded that Balsiger waived his right to counsel after conducting multiple hearings, listening to Balsiger's plans to retain new counsel and purported challenges in doing so, and ultimately concluding that Balsiger had engaged in deliberate delay and manipulation tactics. Sitting ringside uniquely positioned the district judge to gauge the genuineness of Balsiger's efforts and ability to retain counsel, and we are not quick to displace the credibility findings underlying those determinations.

Our review can account for this reality while also taking a fresh look at the district court's ultimate conclusion that a defendant waived his right to counsel. We do this by reviewing the district court's findings of fact, including assessments of a defendant's credibility, for clear error, and then determining whether those findings support as a legal matter the court's conclusion that a defendant waived his right to counsel. This approach aligns closely with the course we chart in other areas of criminal procedure implicating a defendant's constitutional rights. See, *e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that whether reasonable suspicion exists for an investigatory stop or whether probable cause exists for a

warrantless search are questions entitled to *de novo* review, yet underlying "findings of historical fact [are reviewed] only for clear error" while also affording "due weight to inferences drawn from those facts by resident judges and local law enforcement officers"); see also *United States v. Shabaz*, 579 F.3d 815, 819–20 (7th Cir. 2009) (explaining that the ultimate conclusion of whether a *Miranda* waiver was knowing and voluntary is reviewed *de novo*, but the district court's findings of fact and credibility determinations are reviewed for clear error).

With the standard of review in place, the question here is whether Balsiger waived his right to counsel. A waiver must be knowing and intelligent as well as voluntary and unequivocal. See *Clark*, 774 F.3d at 1112. In assessing voluntariness, we have recognized that a defendant is not offered a voluntary choice if the decision put to him is to proceed with incompetent counsel or no counsel at all. *Wilks v. Israel*, 627 F.2d 32, 36 (7th Cir. 1980). Indeed, "a choice between proceeding with incompetent counsel or no counsel is in essence no choice at all." *Id.* In *Wilks* we characterized such a circumstance as "constitutionally offensive." *Id.*

Clinging to this language in *Wilks*, Balsiger insists that the district court presented him with a constitutionally offensive choice when, on January 27, 2015, it ordered him to either retain an attorney ready to proceed to trial on the scheduled trial date or go forward without an attorney. As Balsiger sees the facts, the district court forced his hand and left him with "no real choice" because eight months was not enough time for any attorney to prepare adequately for trial.

Once again the record undermines Balsiger's position. In directing Balsiger to retain counsel by February 17, 2015, the court expressed a preference to proceed on the scheduled trial

date of October 26, 2015. In doing so, however, the court expressly remained open to granting a continuance or a severance if Balsiger ever retained counsel. Specifically, the court stressed that it was "not taking any issues off the table with regard to [Balsiger's] representation" and would consider any appropriate motions raised if Esper (or any other attorney) ever entered an appearance. Finally, the record shows that Balsiger's case proceeded to trial in October 2016—more than two years after the death of his attorney, and more than 18 months after the court ordered Balsiger to retain replacement counsel.

Even assuming Balsiger's new lawyer would only have had eight months to prepare, we cannot conclude in these circumstances that such a period was insufficient time to prepare for trial. Nor can we conclude that the district court presented Balsiger with a constitutionally offensive choice when it ordered him to retain replacement counsel without granting a continuance or lifting the *lis pendens*.

Begging to differ and, in a final effort to save his Sixth Amendment claim, Balsiger contends that even if his conduct amounted to a voluntary waiver of his right to counsel, his waiver was neither knowing nor intelligent because the district court failed to ensure he understood "the dangers and disadvantages of self-representation." *Faretta v. California*, 422 U.S. 806, 835 (1975). While "stress[ing] the need for a thorough and formal inquiry as a matter of prudence and as a means of deterring unfounded claims on appeal," we have also recognized situations where a waiver may be valid absent a formal inquiry by the district court. *United States v. Moya-Gomez*, 860 F.2d 706, 733 (7th Cir. 1988). So, too, have we underscored that "a knowing and intelligent waiver … need not

be explicit," *Thomas*, 833 F.3d at 792, and a defendant may waive his right to counsel where, as here, he is able to retain counsel but refuses to do so. See *United States v. Bauer*, 956 F.2d 693, 695 (7th Cir. 1992).

In evaluating whether a waiver was knowing and intelligent, we consider not only the background and experience of the defendant as well as the context of his decision, but also whether the district court conducted a formal hearing and what other evidence establishes the defendant understood the dangers and disadvantages of proceeding *pro se*. See *Moya-Gomez*, 860 F.2d at 736.

Conceding that the district court did not conduct a formal hearing to ensure Balsiger was fully advised of the risks of proceeding *pro se*, the government argues this failure is not dispositive because all other factors point to a knowing and intelligent waiver by Balsiger. The operative inquiry is whether the record as a whole "demonstrates that the defendant knowingly and intelligently waived his right to counsel." *Id*.

Here the record shows Balsiger sufficiently understood the risks of proceeding *pro se*, as he repeatedly asserted he was not waiving his right to counsel and relied on standby counsel during trial, reflecting "an appreciation for the difficulties of self-representation." *Todd*, 424 F.3d at 533. Balsiger's background and experience also point in the direction of a knowing waiver: he was a CEO with a MBA, who touted his prior litigation experience, referring to himself as a "litigious individual." See *id.* (explaining that, "[i]n this context, background and experience includes educational achievements" and "prior experience with the legal system").

Balsiger's own conduct shows that he sufficiently appreciated the risks of going it alone. The case began in December 2007, and Balsiger's attorney died in July 2014. Balsiger was still unrepresented six months later. Over the course of multiple hearings over several months, the district court repeatedly urged him to retain counsel. When his desired attorney was unavailable, and the court refused to permit a delay of 18 months to accommodate Balsiger's choice, Balsiger made a calculated decision to proceed without counsel so he could appeal on Sixth Amendment grounds. This is not guesswork on our part. To the contrary, Balsiger vocalized his desire to "get this [case] to the Seventh [Circuit]" and expressly told the district judge that he preferred not to hire an attorney, but instead to proceed *pro se* and "play the odds":

> [M]y concern is I just looked at all of your rulings and they never go in favor of the defense. So my concern, and still is my concern, is I have to evaluate based on a businessman. And the last thing that I want to do is spend good money for a good attorney, have him submit a motion, and then have that motion denied and somehow, in my mind [indiscernible] the appeals that I feel I have. No offense to you, but I've got to play – businessmen play the odds.

We have held "a defendant who waives his right to counsel for strategic reasons tends to do so knowingly." *Todd*, 424 F.3d at 533. We have likewise warned that a defendant "may not manipulate his right to counsel to undermine the orderly procedure of the courts or subvert the administration of justice." *United States v. Thibodeaux*, 758 F.2d 199, 201 (7th Cir.

1985). Here Balsiger made deliberate decisions regarding his representation and knowingly and intelligently chose to proceed without counsel. The district court rightly concluded that he waived his right to counsel.

## III

Balsiger next challenges his conviction, arguing there was insufficient evidence to establish wire fraud and conspiracy to commit wire fraud.

Ordinarily we will not upset a conviction if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, however, the even more stringent plain error standard applies because Balsiger failed to move for a judgment of acquittal. See *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012). To demonstrate plain error, Balsiger "must show that a manifest miscarriage of justice will occur if his conviction is not reversed." *Id.*

Balsiger's argument largely focuses on the district court's split verdict on the wire fraud counts: an acquittal on counts 1–15 (involving coupons issued by manufacturers represented by NCH Promotional Services) and a conviction on counts 16–25 (involving coupons issued by manufacturers represented by Carolina Manufacturer's Services). Balsiger sees the verdict as so at odds with itself that it warrants reversing his conviction on the fraud committed against Carolina Manufacturer's Services' clients. He roots his contention in the terms and conditions of IOS's contracts for processing retail coupons, insisting that the district court acquitted him on counts 1–15 because the coupon scheme did

not violate IOS's contract with NCH. On the other hand, he posits the court convicted him on counts 16–25 because this practice did violate the terms of IOS's contract with Carolina Manufacturer's Services. But the district court's conclusion was wrong, Balsiger continues, because it was premised on a contract that was not in effect during the period at issue. Balsiger also asserts that the alternative invoicing scheme the government's evidence focused on at trial was limited to NCH clients and was expressly authorized by contract.

Balsiger is right to observe that the different IOS contracts received meaningful attention at sentencing. The district court asked the government to retrieve the contracts, reviewed and contrasted their terms, and relied on them to determine loss amounts. But the record is silent as to what role, if any, the respective contracts played during the guilt phase. More significantly, regardless of what contract was in effect, there was sufficient evidence to support Balsiger's conviction on counts 16–25, which involved ten instances of wire fraud perpetrated against two manufacturers, LeSaffre Yeast (counts 16–20) and S.C. Johnson (counts 21–25), both represented by Carolina Manufacturer's Services.

The evidence showed that IOS sought payment for coupons issued by LeSaffre and S.C. Johnson by lying about where the coupons had been redeemed. The district court also heard testimony that IOS submitted coupons that were clearly "gang cut," meaning Balsiger requested reimbursement for coupons he knew had never been used to purchase a product. The court had ample evidence upon which to conclude that IOS submitted false invoices to Carolina Manufacturer's Services as part of a scheme to cause manufacturers to pay for coupons they otherwise would have rejected.

Likewise, the government presented sufficient evidence to convict Balsiger of conspiracy to commit wire fraud. Nine IOS employees testified that Balsiger designed the fraudulent scheme to cause manufacturers to pay for coupons that they would otherwise reject by lying about where or whether they had been redeemed. For example, one IOS employee testified that Balsiger instructed him on a plan to make Rapid Pay (small store) coupons look as if they had come from some other sources. Other witnesses testified that the scheme included submitting coupons Balsiger knew had never been legitimately redeemed in connection with the purchase of a product by instructing employees to alter the appearance of the coupons to avoid detection.

On plain error review, the trial evidence was more than sufficient to support Balsiger's convictions.

**IV**

Beyond his challenge to the sufficiency of the evidence, Balsiger contends the Eastern District of Wisconsin was not a proper venue for the wire fraud and conspiracy counts because no "criminal acts" or "essential conduct" took place there, and no coconspirator carried out an overt act in the district. Because the wire fraud statute does not contain a specific venue provision, we consider "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Muhammad*, 502 F.3d 646, 652 (7th Cir. 2007). While there is no "mechanical test to determine constitutional venue," we consider "the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for suitable fact-finding." *Id.*

Based on these factors, venue was proper in the Eastern District of Wisconsin. Balsiger and his codefendants knowingly devised and participated in a scheme to defraud manufacturers, some of which were located within the district. The defendants also caused wire transfers in and out of the district in furtherance of the fraudulent scheme. The law requires no more.

## V

Finally, Balsiger challenges his sentence, arguing the district court erred in calculating loss, awarding restitution, and calculating forfeiture.

We review loss calculations for clear error and will only reverse if we are "left with a definite and firm conviction that a mistake has been made." *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007). No such error occurred here. To the contrary, the district court calculated a loss amount that was quite favorable to Balsiger. The government contended the loss amount was $185 million. While the Probation Office agreed, the court found the loss was a third of this amount— $65 million. To arrive at this amount, the court first determined that between April 2000 and December 2003, Balsiger directed IOS to falsely invoice more than $265 million in Rapid Pay coupons. The court then deducted the portion related to counts of acquittal ($164.3 million), which left $100.7 million in diverted coupons. The court next took account of the fact that manufacturers typically reject between 60–90% of Rapid Pay (small retailer) submissions. Or, put another way, the court estimated that manufacturers would have reimbursed at least 40% of the coupons in the absence of the deception orchestrated by Balsiger. The district court applied this percentage to reach a loss amount of $60.4 million

From this amount, the court estimated actual loss of over $65 million, relying on the fact that the high range of the percentage went up to 90%, and the scheme continued for two years after 2003. We cannot say this approach was unreasonable.

Balsiger further challenges the district court's order of restitution, asserting that because the government did not prove any loss, no restitution should have been ordered. We "will disturb a restitution order only if the district court relied upon inappropriate factors when it exercised its discretion or failed to use any discretion at all." *United States v. Middlebrook*, 553 F.3d 572, 579 (7th Cir 2009). Here the restitution order was premised on the court's approximation of the loss caused by Balsiger's offense conduct. Because there was no error with the court's loss approximation, the court's order of restitution was also appropriate. See *United States v. Durham*, 766 F.3d 672, 687 (7th Cir. 2014).

What remains is Balsiger's challenge to the court's forfeiture calculation. We review the district court's findings of fact for clear error and its interpretation of the forfeiture statute *de novo*. See *United States v. Baker*, 227 F.3d 955, 967 (7th Cir. 2000).

Balsiger's commission of wire fraud and the accompanying conspiracy offense (both under 18 U.S.C. § 1343) subjected him to an order of forfeiture. The criminal forfeiture statute, 18 U.S.C. § 982, only authorizes forfeiture in a wire fraud case when the offense conduct affects a financial institution. See 18 U.S.C. § 982(a)(3)(F). The government, therefore, sought—and the district court ordered—forfeiture under the civil forfeiture statute, 18 U.S.C. § 981, which (through some internal cross-referencing) authorizes the forfeiture of proceeds traceable to

wire fraud. See 18 U.S.C. § 981(a)(1)(C) (referencing 18 U.S.C. § 1956(c)(7), which, in turn, references offenses listed in § 1961(1), which include § 1343, the wire fraud statute). Civil forfeiture applies by virtue of the bridging provision in 28 U.S.C. § 2461(c), which Congress added to the U.S. Code through the enactment of the Civil Asset Forfeiture Reform Act of 2000. (Congress amended § 2461 in 2006, but those amendments are of no moment to this appeal.)

Having navigated this statutory maze, we come to the question presented: how to define the "proceeds" subject to forfeiture as a result of Balsiger's criminal conduct. The parties extend two competing invitations based upon two definitions of "proceeds" in 18 U.S.C. § 981(a)(2). The district court adopted the government's view that proceeds should be defined under subsection (A), which applies to cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes" and states that the forfeited amount is the gross profit realized from the offense conduct. 18 U.S.C. § 981(a)(2)(A)

Balsiger, on the other hand, contends that the district court should have selected the definition of "proceeds" in subsection (B), which applies in "cases involving lawful goods or lawful services that are sold or provided in an illegal manner." 18 U.S.C. § 981(a)(2)(B). This definition limits forfeiture to the "amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id*.

Balsiger's construction of the two competing definitions of proceeds is correct on the facts presented here. His fraud involved acts of deception through the redemption of retail coupons—"lawful goods" within the meaning of

§ 981(a)(2)(B)—which, when fraudulently submitted for reimbursement, were provided in an "illegal manner."

The government's contrary preference for the broader definition of proceeds in § 981(a)(2)(A) misreads the statute and overextends its reach. Classifying retail coupons as "illegal goods" is strained, and calling Balsiger's wire fraud "unlawful activity" within the meaning of § 981(a)(2)(A) risks rendering § 981(a)(2)(B) superfluous and thus meaningless. If all unlawful conduct falls within subsection (A), it is far from clear what is left to fit within subsection (B). We cannot conclude Congress intended this result given the differences in language employed in subparts (A) and (B) of § 981(a)(2).

For these reasons, we AFFIRM Balsiger's conviction and sentence with the limited exception of the district court's order of forfeiture, which we REVERSE. We REMAND for the limited purpose of allowing the district court to determine the proper amount of forfeiture.