In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 19-2718

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KURT JOHNSON,

*Defendant-Appellant.*

―――――――――――

Appeal from the United States District Court for the
Southern District of Illinois.
No. 18-cr-40043 — **J. Phil Gilbert**, *Judge.*

―――――――――――

ARGUED SEPTEMBER 29, 2020 — DECIDED NOVEMBER 17, 2020

―――――――――――

Before ROVNER, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Kurt Johnson elected to represent himself at trial on federal fraud charges. In Johnson's own telling, he fared at trial "like a bug under a hard-stomping prosecution boot heel"—which is to say he lost. Johnson now appeals his waiver of counsel. He says the district court failed to confirm that his decision to waive counsel was knowing and intelligent. We agree that the district court's colloquy with Johnson was lacking, but we nonetheless uphold Johnson's

waiver of counsel. This was not Johnson's first rodeo—as he
himself told the district court. In fact, Johnson had previously
represented himself at a federal fraud trial, lost, and then un-
successfully appealed that waiver of counsel. Given this his-
tory, and Johnson's separate and more thorough colloquy
with the magistrate judge in this case, we cannot conclude
that Johnson's decision to forgo counsel the second time
around was uninformed. We also reject Johnson's challenge
to the district court's sentencing explanation. We thus affirm
his conviction and sentence.

## I. Background

Johnson, whom the Bureau of Prisons designates as a
"sovereign citizen," has a long history of fraud, often target-
ing government employees. We confine our discussion to two
of his fraudulent schemes: (1) a 2005 mail-fraud conspiracy;
and (2) a 2018 bankruptcy-fraud scheme that Johnson carried
out while in prison for the mail-fraud conspiracy. This appeal
arises from the bankruptcy-fraud scheme, but Johnson's ex-
perience in the mail-fraud case provides important context for
his decision to represent himself at his bankruptcy-fraud trial.

### A. Mail-Fraud Case

In 2005, Johnson was indicted for mail fraud in the North-
ern District of California after he and others conspired to de-
fraud lending institutions of tens of millions of dollars
through a bogus mortgage-elimination scheme that also
harmed thousands of homeowners. Johnson and a codefend-
ant represented themselves at a month-long jury trial. At trial,
Johnson wore his prison garb in front of the jury and pre-
sented nonsensical defenses. Still, he showed himself capable
of basic trial tasks. He made an opening statement and a

closing argument, cross-examined witnesses, argued jury instructions, and testified on his own behalf.

The jury convicted Johnson on one count of mail-fraud conspiracy and 34 counts of mail fraud. Johnson appealed his conviction to the Ninth Circuit. Among other things, he blamed the district court for letting him represent himself. The Ninth Circuit was unpersuaded. It found that Johnson was a "fool," but he was not incompetent. As such, he had a right to "go down in flames," and it was "a right the district court was required to respect." *United States v. Johnson*, 610 F.3d 1138, 1140 (9th Cir. 2010). The district court had "extensively advised" Johnson of his right to counsel and the disadvantages of self-representation—indeed, it had "practically begged" him to accept counsel—so his waiver stood. *Id.*

Johnson received 300 months' imprisonment for the mail-fraud conviction. In 2014, he was transferred to a U.S. penitentiary in the Southern District of Illinois.

**B. Bankruptcy-Fraud Case**

**1. The Scheme**

On January 8, 2018, while in prison for mail fraud, Johnson caused involuntary bankruptcy petitions to be filed against the warden and another employee of his prison unit. The petitions alleged that both individuals owed Johnson $21 billion pursuant to a judgment from the "World Court in Netherlands." After filing the petitions, Johnson purportedly cancelled $1 billion of the debt so that he could force 28 other victims, including more prison staff, to claim the $1 billion as income. Johnson's apparent purpose in filing the false bankruptcy petitions was to publicize the victims' personal information and harm their credit.

The filings led the U.S. Bankruptcy Court in the Southern District of Illinois to open Chapter 7 involuntary bankruptcy cases against the warden and the other prison employee. Fortunately, federal prosecutors got the court to seal the petitions the day after they were opened and then moved to dismiss the petitions. The bankruptcy court dismissed the petitions on February 21, 2018, after holding a hearing at which the warden and the other employee appeared. Johnson unsuccessfully appealed that dismissal to the district court. The warden and other employee did not suffer financial or credit-related harm, but they did receive numerous mailings related to having bad credit and filing for bankruptcy. Johnson unsuccessfully sought the personal identifiers of the other 28 victims.

Johnson was charged in the Southern District of Illinois with two counts of bankruptcy fraud, in violation of 18 U.S.C. § 157, and two counts of making a false declaration in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3).

### 2. Initial Appearance

Johnson did not have counsel at his initial appearance. He offered to "discharge" the indictment and repeatedly insisted that he was not the defendant. After declining Johnson's offer to "discharge" the indictment, the magistrate judge informed him of his right to a court-appointed attorney "in this matter," and asked, "I understand that you have made the decision that you would like to represent yourself. Is that true?" Johnson responded, "Not myself, but somebody's got to represent the defendant, so." The magistrate judge then asked Johnson a series of questions to confirm his decision to proceed pro se.

The magistrate judge first asked Johnson if he had studied law. Before answering, Johnson "cut to the chase" and told

the magistrate judge that his competency to represent himself had "already been established and affirmed on appeal." He explained that he "[d]id a whole two-week trial in California … and that became the subject matter of the appeal and it was affirmed." Circling back to the court's question, he said he was "not a student of the law." The magistrate judge then confirmed that Johnson had not represented himself in any other criminal cases. The magistrate judge proceeded to ask Johnson if he understood the charges against him; the statutory maximums for the charged offenses; the possibility of consecutive sentences; the role of the sentencing Guidelines; that the court could not advise him; and the existence and binding character of the Federal Rules of Evidence and the Federal Rules of Criminal Procedure. After Johnson confirmed his understanding of these things, the magistrate judge advised him that a lawyer would represent him "far better" than he would himself and that it was "unwise" to proceed pro se because of his lack of familiarity with the law and procedural rules. The magistrate judge "strongly urge[d]" him to accept counsel. Still, Johnson confirmed that he wished to proceed pro se, and that his decision was voluntary.

The magistrate judge found that Johnson had knowingly and voluntarily waived his right to counsel for purposes of the initial appearance.

### 3. Final Pretrial Conference

At the final pretrial conference, the district judge asked Johnson if he wanted appointed counsel. Johnson replied, "that ship has sailed." The judge offered to revisit the issue and appoint legal counsel or even standby counsel. Johnson declined. The judge then asked Johnson a series of questions about his decision to proceed pro se. The judge first asked

Johnson if he had any legal training. He said he did not. The judge then asked why Johnson wanted to represent himself. Johnson said he simply did not need an attorney. The judge inquired whether Johnson had represented himself at trial before, and Johnson said he had a "half a dozen" times, including in a jury trial. Johnson confirmed that he understood court procedures and jury selection. As he had at the initial appearance, Johnson told the judge that his "competency was affirmed on appeal, so I think we are all right on that." In response to further questions, Johnson told the judge that he had a seventh-grade education; understood English; was 55 years-old; took no medications; and had been incarcerated for 14 years.

The judge found that Johnson was competent to represent himself, and that he had validly waived his right to counsel. The judge emphasized that Johnson had previous experience with courtroom procedures and jury trials.

### 4. Trial

Before trial, Johnson filed a host of pretrial motions. Most were frivolous, such as his motion for a mental examination of the prosecutor. Johnson also moved to subpoena various witnesses. The district court granted some of his requested subpoenas and denied others. At trial, Johnson cross-examined the government's witnesses, called his own witnesses, testified on his own behalf, and offered exhibits that the court admitted. He also made an opening statement and a closing argument. True to form, Johnson's trial arguments were gibberish, characterized by statements like, "the United States is a figment of our imagination," and "[i]f you can follow the laws that really matter, the truth will set me free." Following

his conviction on all counts, he unsuccessfully moved for a new trial and judgment as a matter of law.

### 5. Sentencing

Johnson accepted counsel for sentencing. His advisory Guidelines range was 240 months' imprisonment (five years for each of the four counts). It would have been much higher—life imprisonment—if each count had not had a statutory maximum of five years. The driving force behind the high Guidelines range was the 30-level increase that resulted from Johnson's "intended loss" of $20 billion.

Johnson objected to the loss calculation on the ground that $20 billion bore no relation to reality and there was no actual loss. The government responded that the $20 billion loss calculation was correct, while conceding that the court could vary downward if it found that the offense level overstated the seriousness of Johnson's offense. The court overruled Johnson's intended-loss objection. Johnson also argued that the government's recommended sentence of 240 months was tantamount to a life sentence for him, because he was 55 at the time. According to actuarial tables, Johnson's life expectancy was 81. Yet the government's proposed sentence (on top of Johnson's current mail-fraud sentence) would keep him in jail until 88. Johnson argued that his fantastical scheme did not warrant a de facto life sentence.

The court sentenced Johnson to 216 months' imprisonment, to run consecutive to Johnson's current sentence. The court described its sentence as a nine-level downward variance from an offense level of 43 to 34. It found that the intended loss was $20 billion, even if it would have been impossible for Johnson to recover that amount. With respect to

Johnson's life-sentence argument, the court explained that it was not its job to decide how long Johnson would live. It described Johnson as a "healthy individual" who could "easily live to be in [his] 90s." The court hoped that Johnson would live long enough to get out of prison, but it also hoped that when he got out, he would "abide by the rules and laws of society."

Johnson now appeals his conviction and sentence.

## II. Discussion

Johnson makes two arguments on appeal. First, he submits that the district court should not have allowed him to proceed pro se during pretrial proceedings and at trial. Next, he claims that the court failed to adequately consider his lack of intent to cause a $20 billion loss, the "unreality" of his scheme, and the possibility that he would die in prison.

### A. Self-Representation

We review a district court's legal determination that a defendant waived counsel de novo, while considering its predicate factual findings for clear error. *United States v. Balsiger*, 910 F.3d 942, 951–52 (7th Cir. 2018).

Criminal defendants have a Sixth Amendment right to self-representation. *Faretta v. California*, 422 U.S. 806 (1975). A defendant's waiver of counsel must be knowing and intelligent. *Id.* at 835. "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)).

"Because of the importance of the right to counsel in our constitutional scheme, we do not lightly conclude that a defendant has waived his right to counsel." *United States v. Sandles*, 23 F.3d 1121, 1125–26 (7th Cir. 1994). We indulge every reasonable presumption against waiver. *Smith v. Grams*, 565 F.3d 1037, 1044 (7th Cir. 2009).

We consider four factors to assess whether a defendant's waiver was knowing and intelligent: "(1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself; (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to waive his right to counsel." *United States v. Cooper*, 591 F.3d 582, 587 (7th Cir. 2010) (quoting *United States v. Todd*, 424 F.3d 525, 530 (7th Cir. 2005)). These factors are neither exhaustive nor inflexible; rather, they are "useful inquiries" that guide the ultimate determination of whether the defendant's waiver was knowing and intelligent. *Cooper*, 591 F.3d at 587; *see Todd*, 424 F.3d at 530; *see also United States v. Eads*, 729 F.3d 769, 775 (7th Cir. 2013) ("[O]ur task is to examine the record as a whole to see if [the defendant] 'knowingly and intelligently' waived his right to counsel." (quoting *Faretta*, 422 U.S. at 835)).

Johnson contends that the district court's abbreviated colloquy with him prior to trial was insufficient to produce a knowing and intelligent waiver of counsel. To begin, we agree with Johnson that the district court's colloquy was lacking. While a district court need not hold a separate hearing dedicated to the issue of self-representation, it should engage in a "thorough and formal inquiry" with a defendant that probes

his age, education level, and understanding of the criminal charges and possible sentences. *Sandles*, 23 F.3d at 1126. The court should also inform the defendant of the difficulties of proceeding pro se. *Id.* In this case, the district court asked Johnson about his age, education, legal training, and experience as a criminal defendant in past trials. Yet the judge failed to confirm Johnson's understanding of the charges against him or the severe penalties that could flow from a conviction on those charges. The judge also did not specifically discuss the difficulties of proceeding pro se with Johnson. The district court's colloquy was deficient. We urge courts to do better.

Nevertheless, "failure to conduct a full inquiry is not necessarily fatal," *Todd*, 424 F.3d at 531, and these shortcomings are immaterial here because the record leaves little doubt that Johnson knew only too well the dangers of going pro se. Johnson had previously acted as his own counsel in a lengthy mail-fraud trial in California. *See id.* at 533 (We consider "prior experience with the legal system (including prior pro se representation)") (quoting *Sandles*, 23 F.3d at 1128)). The trial did not go well, and Johnson paid a steep price for it—300 months in prison. Following his conviction, Johnson unsuccessfully appealed his waiver of counsel to the Ninth Circuit. Johnson was still in prison for mail fraud when he decided to represent himself at his bankruptcy-fraud trial. Against this backdrop, we find it inconceivable that Johnson did not understand and sufficiently appreciate the risks of proceeding pro se, especially when he himself touted his prior self-representation as proof that he did not need counsel.

In Johnson's view, his bad performance at the first fraud trial only bolsters his argument that the district court should not have let him serve as his own counsel the second time

around. Johnson's argument misunderstands the nature of our inquiry. We ask whether Johnson knowingly and intelligently waived counsel—that is, whether he knew what he was doing and made his choice "with eyes open." *Faretta*, 422 U.S. at 835 (quoting *Adams*, 317 U.S. at 279). We do not probe the defendant's likelihood of success in self-representation. *Tatum v. Foster*, 847 F.3d 459, 469 (7th Cir. 2017) ("[T]he Supreme Court's *Faretta* line of cases focus only on competence as it relates to mental functioning, and forbids the consideration of competence in the sense of accomplishment."). Both savvy and foolish defendants have a constitutional right to self-representation.

We find additional evidence of Johnson's knowing and intelligent waiver in the magistrate judge's more robust colloquy with him. The magistrate judge dutifully asked the pertinent questions, and strongly advised Johnson against proceeding pro se. The magistrate judge's colloquy with Johnson further satisfies us that Johnson made an informed decision to proceed without counsel at trial. Johnson counters that the magistrate judge's colloquy only applied to the initial appearance and did not extend to trial. Even so, the information that the magistrate judge conveyed—including the nature of the charges and the potential penalties—was relevant at all stages of the proceedings. Indeed, the magistrate judge's colloquy was clearly still in Johnson's mind at the final pretrial conference when Johnson told the district judge that the "ship ha[d] sailed" on the self-representation issue.

Assuming that the magistrate judge's colloquy with Johnson produced a valid waiver, he argues that changed circumstances between the initial appearance and the final pretrial conference—such as the denial of his frivolous pretrial

motions and new discovery from the government showing its strong case against him—required the district court to ensure that Johnson wished to persist in his earlier waiver of counsel. *See United States v. Fazzini*, 871 F.2d 635, 643 (7th Cir. 1989). This argument gets Johnson nowhere. As we have already explained, the district court *did* revisit Johnson's waiver. To the extent the district court's colloquy was deficient (which it was), other aspects of the record, including Johnson's background and experience, as well as the magistrate judge's colloquy with him, compensate for those deficiencies.

Nor do we find that Johnson's minimal education and lack of formal training rendered his waiver invalid. Johnson reminds us that he has only a seventh-grade education and no legal training. But "[t]his Court examines the background and experience of the defendant merely to gauge whether he appreciated the gravity of his waiver, not in the hopes of finding adequate legal training." *United States v. England*, 507 F.3d 581, 587 (7th Cir. 2007). Johnson does not suggest that his lack of education and training prevented him from appreciating the gravity of his waiver. Moreover, while Johnson had minimal formal education, he had extensive experience in the judicial system, including courtroom advocacy experience from his earlier pro se trial. *See Todd*, 424 F.3d at 533. On these facts, Johnson's minimal education did not prevent him from acting as his own counsel.

At bottom, Johnson seems to believe that the district court should not have let him represent himself because he was committed to presenting frivolous legal theories. But Johnson does not contend that he was incompetent. He concedes that he was of sound mind. Johnson knew the risks of proceeding

pro se, so his knowing and informed decision to waive coun-
sel stands.

## B. Adequacy of Sentencing Explanation

Shifting gears, Johnson argues that the district court pro-
cedurally erred at sentencing by failing to adequately con-
sider three of his mitigation arguments: (1) his perception of
the facts was so irrational that he cannot be said to have in-
tended the $20 billion loss; (2) the unrealistic nature of his
scheme makes it unfair to hold him accountable for the full
$20 billion intended loss; and (3) the court should not impose
a de facto life sentence.

We review questions of procedural error at sentencing de
novo. *United States v. Courtland*, 642 F.3d 545, 550 (7th Cir.
2011). A judge's "fail[ure] to adequately explain the chosen
sentence" is a procedural error. *Gall v. United States*, 552 U.S.
38, 51 (2007). At sentencing, a judge must address a defend-
ant's principal mitigation arguments, provided they have a
legal and factual basis. *United States v. Vidal*, 705 F.3d 742, 744
(7th Cir. 2013). "We have required resentencing both when the
district court is silent about the defendant's principal argu-
ment in mitigation, and when the district court's discussion is
so cursory that we are unable to discern the court's reasons
for rejecting the argument." *Id.* (internal citations omitted); *see
also Gall*, 552 U.S. at 50 (explaining that a sentencing judge
"must adequately explain the chosen sentence to allow for
meaningful appellate review and to promote the perception
of fair sentencing").

### 1. Lack of Intent

First, relying on the fanciful nature of his quest for $20 bil-
lion, Johnson argues that the district court should have

considered his lack of intent. The sole legal basis for Johnson's argument is dicta from the Sixth Circuit's decision in *United States v. McBride*, 362 F.3d 360 (6th Cir. 2004). There, the Sixth Circuit opined that "there is surely some point at which a perpetrator's misperception of the facts may become so irrational that the words 'intended loss' can no longer reasonably apply." *Id.* at 374. "For instance, if someone vandalized a federal building by spray painting an incantation that all government gold shall disappear, the 'intended loss' would presumably not be the value of all the gold in Fort Knox, even if the vandal genuinely believed that all the gold would disappear." *Id.*

Johnson's argument fails for a simple reason: he did not make this argument in the district court, or even cite *McBride*. To be sure, he made related arguments. He challenged the intended-loss calculation and asked for a downward departure based on the economic-reality principle (an argument we discuss below). He also argued, in passing, that he only intended to harass the victims—not get $20 billion. But now, Johnson makes a new argument. He argues, relying exclusively on *McBride*, that the district court failed to adequately consider whether he so misperceived the facts that he did not actually intend the $20 billion loss. In his appellate briefing, Johnson takes pains to distinguish this new argument from his economic-reality argument and the miscalculation-of-loss argument that he made in the district court. The district court had to address Johnson's main mitigation arguments, but it certainly did not have to address arguments that Johnson did not make, especially one based solely on dicta from a non-binding jurisdiction.

### 2. Economic-Reality Argument

Second, Johnson argues that the court failed to adequately address his economic-reality argument. The federal sentencing Guidelines provide, for economic offenses, that "[t]here may be cases in which the offense level … substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." USSG § 2B.1.1, comment. (n.21(C)). Consistent with that principle, we have recognized an "economic reality" doctrine that allows a sentencing court to depart downward if intended losses bear no relation to economic reality. *United States v. Stockheimer*, 157 F.3d 1082, 1089 (7th Cir. 1998).

This argument also fails. Johnson's economic-reality argument has a legitimate legal and factual basis. Still, we cannot conclude that the district court failed to adequately consider it. The judge's discussion of the argument with the parties spans six pages of the sentencing transcript. The court accurately summarized the argument, asked both parties questions about it, and let both parties make oral arguments. The parties argued—and the court acknowledged—that the court could vary downward if the intended loss substantially overstated the seriousness of the offense. Relying on the Guidelines, the court explained why the intended-loss calculation was accurate, even if it was impossible for Johnson to recover the $20 billion. At the same time, it recognized that Johnson's argument "may be a matter for the Court to consider in determining the sentence." And then, when imposing its sentence, the court said: "The Court is considering the arguments of counsel and recognizing the Court can vary downward." Sure enough, the court varied down nine offense levels. The record shows that the court thoroughly considered Johnson's

economic-reality argument, and apparently varied downward because of it. We find no procedural error here.

### 3. De Facto Life Sentence

Johnson's final argument is that the district court inadequately considered whether its 216-month sentence would likely lead him to die in prison. We have observed that "[t]here is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006). Armed with actuarial tables showing the life expectancy for a 55-year-old white man, Johnson's counsel argued that the court should not give Johnson a de facto life sentence. The court addressed Johnson's life-sentence argument by commenting that it had no control over how long Johnson would live. It hoped that Johnson, a seemingly healthy individual, would outlive his sentence, but it could not determine whether he would. It added: "I hope when you get out of prison that you have the mental state that you're going to abide by the rules and laws of society." In other words, the court considered Johnson's argument and rejected it. This was not a case where the court failed to appreciate that it was imposing a potential life sentence. *Cf. United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013). The court acted within its discretion in rejecting Johnson's argument. Johnson does not substantively challenge his sentence, so we will not consider the reasonableness of the court's treatment of his argument.

### III. Conclusion

Johnson knowingly and intelligently waived his right to counsel before trial, and the district court adequately addressed his mitigation arguments at sentencing.

AFFIRMED.