In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-2266

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAMUEL NICHOLS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cr-00756-1 — **Virginia M. Kendall**, *Judge.*

_____

ARGUED JANUARY 18, 2023 — DECIDED AUGUST 8, 2023

_____

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit
Judges.*

KIRSCH, *Circuit Judge.* The Sixth Amendment guarantees
defendants the effective assistance of counsel. At the same
time, the Constitution does not demand that defendants accept that assistance: The Sixth Amendment guarantees a defendant's right to forgo counsel's assistance and defend himself. This case is about the intersection of those sometimes
counterposed rights.

Samuel Nichols was sentenced to life in prison after representing himself against a multi-count sex trafficking indictment. With the aid of counsel, Nichols now argues that the district court erred in allowing him to go it alone because he was incapable of representing himself. But district courts are not permitted to foist counsel upon competent defendants, so we affirm.

I

The details of Samuel Nichols's criminal conduct are unimportant to his appeal. It suffices to say that Nichols engaged in sex trafficking, a federal crime, and sometimes used violence in the process. The government first brought charges for those offenses in December 2015. If convicted, Nichols faced a maximum sentence of Life.

The district court appointed James Graham and Heather Winslow to represent Nichols. Graham and Winslow both have extensive experience representing defendants facing various sex trafficking charges. The first eight months of their representation proceeded without fanfare. Then, things changed.

A

In September 2016, Graham and Winslow moved to dismiss the indictment under the Speedy Trial Act. They did so noting that, while "these issues lack merit," "these motions are of great importance to Mr. Nichols"; the pair believed that "failing to file the instant motions would result in a breakdown of the attorney/client relationship." The district court, predictably, denied the motion.

Despite the pair's efforts, the relationship broke down anyway. In March 2017, Nichols filed a pro se motion seeking an

ex parte hearing. Nichols claimed that Graham and Winslow failed to file various motions related to perceived multiplicity (or different counts charging the same wrongdoing) in the indictment against him. Their failure to do so, Nichols contended, amounted to ineffective assistance of counsel. At a status hearing on that motion, the district court issued what would be the first of many warnings to Nichols about the perils of self-representation. Nichols responded that he "would rather just have new counsel." The district court replied, "You don't just get to have a revolving door of counsel. I've given you two. I have two very talented defense attorneys. You don't get any more. You don't get a third because you don't like them." The district court then told Nichols to confer with Graham and Winslow about the consequences of proceeding pro se and informed him that it would not appoint new counsel. After Nichols and his attorneys conferred and asked for some time to decide, the district court added:

> Here's what I'm going to tell you right now, Mr. Nichols. I'm going to say it very directly and very cleanly. I am not giving you another lawyer if you get rid of these two lawyers. I've already given you two. You have a constitutional right to have a lawyer represent you in a felony criminal charge such as this. You should have a lawyer represent you. If you cannot work with your lawyers, then I cannot make them represent you because they have an obligation to only file motions with me that are under the facts and the law that are accurate, okay? So if you choose not to work with them, you must go on your own. And that's not a smart idea. You don't

have training. You don't have the experience. And it's not a smart idea.

Nichols felt he was between a rock and a hard place:

> NICHOLS: And I understand what you saying, too. But you putting me in a tough position.
>
> DISTRICT COURT: No, you're putting yourself in that position.
>
> NICHOLS: I'm not. I'm just trying to do what I feel is best for me, but the Court—
>
> DISTRICT COURT: What's best for you is to be represented by a lawyer who knows the law.
>
> NICHOLS: I'm going to let you—I'm not trying to give you no hard time, so whatever you all do, you all going to do anyway.
>
> DISTRICT COURT: It's going to be your choice, not mine.

The next month, Nichols informed the court that he wished to discharge Graham and Winslow.

> NICHOLS: I would still like to stick with what I was trying to do in the first place.
>
> DISTRICT COURT: Which is what?
>
> NICHOLS: I told you I—you said you wasn't going to appoint me new counsel, but that's what I wanted. So I don't know how it's going to work or what's going to happen, but that's— that's still what I would like to do.

***

DISTRICT COURT: So you are going to reject these two attorneys to get a new attorney? For what reason?

NICHOLS: That's what I would like to do.

DISTRICT COURT: No, why? You don't get to do that. You have a right to have an attorney. You have a constitutional right to have someone represent you, and I'm giving you that right. Why are you rejecting Mr. Graham and Ms. Winslow?

Nichols explained his belief that insufficient progress had been made in his case and took exception once more to Graham and Winslow's refusal to make frivolous arguments. He concluded that "I just don't feel like it's in my best interest to stick with these attorneys." After a final admonition that Nichols was not getting another attorney, the district court distilled the question to its essence:

DISTRICT COURT: Are you going to work with Mr. Graham?

NICHOLS: No.

DISTRICT COURT: Are you going to work—

NICHOLS: No.

DISTRICT COURT: —with Ms. Winslow? Okay. So then they have irreconcilable differences. They can't represent you. And you have fired them. They're gone. They are allowed to be off. And I'm not giving you another lawyer.

NICHOLS: Okay.

> DISTRICT COURT: It doesn't work that way. You
> don't just keep getting lawyers because you
> don't like their advice.
>
> NICHOLS: That's not what I said. But, okay, I un-
> derstand.
>
> DISTRICT COURT: So you're on your own.
>
> NICHOLS: I understand.

Even after Graham and Winslow were appointed standby
counsel, Nichols objected. The pair, according to Nichols,
"made arguments in favor of the government" by citing bind-
ing caselaw that the government and district court relied on
in denying the frivolous motion to dismiss. Nichols believed
they had an intolerable conflict of interest and felt that his
right to effective assistance of counsel was not being honored.
Nichols wrote that his legal knowledge was "not up to [the]
standard to represent myself at this point, thus making [me]
feel that the courts are forcing me to go pro se." Nichols once
again asked that the court appoint him new counsel and re-
move Graham and Winslow as standby counsel. The district
court denied that request, concluding that Nichols had no ba-
sis for rejecting Graham and Winslow.

B

In August 2017, Nichols asked to be evaluated by a psy-
chologist to determine whether he was competent to stand
trial and represent himself. Nichols stated that his mental
state—he had diagnoses for depression, anxiety, and
ADHD—was "making it difficult to prepare for trial." The
district court tried to hold a hearing on his motion, but Nich-
ols refused to appear. Graham and Winslow, however, did at-
tend; they stated that, based on their interactions with

Nichols, they did not think a competency evaluation was nec-
essary in the first place.

Still, the district court ordered the requested evaluation
and tasked Dr. Diana Goldstein with determining whether
Nichols was suffering from a mental disease or defect that
would impair his ability to prepare for trial or represent him-
self at trial. The court selected Dr. Goldstein, in part, because
she had performed thousands of similar examinations.

Dr. Goldstein spent 14 hours with Nichols over two days;
he cooperated with her examination. After administering a
battery of tests, Dr. Goldstein concluded that Nichols was
competent to stand trial and to proceed pro se if he wished.
Of particular note, Dr. Goldstein suggested that Nichols
might be feigning a mental disorder. She also found no evi-
dence of any significant psychiatric disorder, past or present.
Dr. Goldstein recounted Nichols's long history of significant
behavioral problems and learning difficulties, including peri-
ods of medication and hospitalization, as well as time spent
as a ward of the state. The behavioral issues led Dr. Goldstein
to conclude that Nichols might have suffered from an opposi-
tional-defiant or conduct disorder. But she also concluded
that, because such disorders are behavioral rather than men-
tal, neither impacted Nichols's ability to understand the pro-
ceedings against him, and his competency was thus unaf-
fected.

The district court scheduled a hearing to discuss Dr. Gold-
stein's evaluation and conclusions. Yet again, Nichols refused
to appear at that hearing. After the district court authorized
the Marshals to guarantee Nichols's appearance in court, the
district court held a hearing to discuss Dr. Goldstein's report
with Nichols, his standby counsel, and the government.

At that hearing, Nichols requested that he undergo a second evaluation by an expert of standby counsel's choosing, which the district court granted. The district court also conducted an extensive colloquy with Nichols based on his continued insistence that he wanted a new lawyer, rather than to represent himself. The district court canvassed Nichols's educational background, lengthy criminal history, lack of legal training, prior experiences with attorneys (he sometimes fired them), experience with trials (one bench trial), unfamiliarity with federal court, and the consequences he faced if convicted of the charges against him. The district court then found once again that Nichols had constructively waived the right to counsel by refusing to work with Graham and Winslow. And, once again, the district court presented Nichols with three options: work with appointed counsel, retain private counsel, or proceed pro se. By default, he chose to represent himself.

Standby counsel selected Dr. Michael Fields to perform the second competency evaluation. But Dr. Fields was unable to complete a single test because of Nichols's obstreperous behavior throughout the examination. Without his own results, Dr. Fields drew from Dr. Goldstein's report, conversations with standby counsel, and a 90-minute interview he conducted with Nichols to write his report. Dr. Fields concluded that Nichols understood "the nature and consequences of the proceedings against him" and that Nichols's "competency to stand trial [was] not diminished by a severe emotional disorder." Still, Dr. Fields concluded that Nichols could not stand trial because he could not work with the representation that he was being offered: It was Dr. Fields's "clinical sense" that Nichols's "lack of willingness to work with legal counsel" rendered him incompetent.

The district court held a contested competency hearing at which both experts testified and were cross-examined. The government first introduced recorded jail calls between Nichols and various associates. On one call, Nichols said:

> I got [trial] pushed back. It's pushed back all the way to March, shit, cause I'm working on this, I'm working on this shit and trying to get myself up out of here and trying to find loopholes and shit. I still need a lot of time.
>
> ***
>
> I really don't want to go to trial. I really want to get enough shit on [the victims] so [the government] can probably, like give me a plea or do some you know what I'm saying and do something better than what they talking.

In response to an associate's question about whether he had an attorney, Nichols added the following:

> The attorneys are terrible. I fired their ass, bro. I fired their ass and then my Judge forced them to be my standby counsel, so right now I'm, I'm pro se right now but they my stand, they—they my standby counsel, the attorneys that I fired.

Nichols's associate then became incredulous:

> ASSOCIATE: Oh man, I don't care what—I don't care what books you done read [ ]. Ain't no way in hell you is gonna be better than—you yourself is gonna be better than the fucking attorney, G. I'm just gonna keep it real with you.
>
> NICHOLS: Yeah, I know that.

After these calls were played, Dr. Goldstein took the stand. She explained the tests she performed to determine Nichols's competency and relayed what she learned about his childhood, upbringing, family life, and educational history. She reiterated her conclusion that, despite Nichols's long history of behavioral and learning difficulties, he was not suffering from a major mental disorder and was more than capable of understanding the proceedings against him. In her opinion, he was "oppositional and defiant," but he could "make a decision to work with someone or not." She concluded that, although "[i]t's never a good idea" to represent yourself, Nichols was "perfectly capable of doing so."

Dr. Fields also testified. He conceded that Dr. Goldstein "did a marvelous job in going through the competency portion of the report" and agreed that Nichols "underst[ood] fairly well the basic aspects of the court and all the things that go [on] in court." Dr. Fields acknowledged that he could not complete any testing but said that additional tests were likely unnecessary: "to go through [the tests] again, you know, probably wouldn't have been any more thorough. And [Dr. Goldstein] had only seen him four months prior." Dr. Fields reaffirmed his opinion that Nichols was not suffering from a severe emotional or mental disorder. In his view, Nichols "was not really willing to work with the legal counsel he [had]. … So he was in somewhat of a conundrum. He understood he really can't do this pro se. He would like to have other legal counsel." Although Dr. Fields couldn't confirm whether Nichols had an emotional disorder due to his inability to complete his own testing, he nonetheless concluded that Nichols "was not really competent to stand trial." He testified that Nichols was "unable to comport himself effectively with representation that[ ] [had] been given to him" and therefore

could not prepare adequately for trial. On cross-examination, Dr. Fields conceded that it was Nichols's own choice to not work with his counsel and that "[b]eing unwilling is not the same as unable."

The district court found Nichols competent at the close of the competency hearing. It credited Dr. Goldstein's report and discounted Dr. Fields's: Dr. Goldstein's report was based on extensive testing; Dr. Fields's was not. Moreover, Dr. Fields's conclusion did not address the court's question. It was Dr. Fields's "clinical sense" that Nichols could not stand trial because he would not work with counsel, but that said nothing about whether Nichols was suffering from a mental disease or defect that inhibited his comprehension of the proceedings against him. On that front, Dr. Fields agreed with Dr. Goldstein's conclusion. The district court drew on Dr. Goldstein's report, the deficiencies in Dr. Fields's, their testimony at the competency hearing, the recorded jail calls, and its own observations of Nichols's in-court demeanor in ultimately finding Nichols competent to stand trial.

After making that finding, the district court reviewed Nichols's options one last time:

> DISTRICT COURT: Your choices I'll go through again. Pro se without working with them, or let them represent you. That's your choice.
>
> [Trial is] starting March 12th. They'll pick a jury on March 12th.
>
> NICHOLS: Okay.

DISTRICT COURT: Are you going to work with them?

NICHOLS: No.

Just before the close of the hearing, Nichols added, "I'm not working with anybody. I'll just accept my fate."

C

Trial began as scheduled on March 12, 2018. The jury convicted Nichols on most of the charges, but it acquitted him of one count. Nichols then accepted the assistance of counsel. Before sentencing, the defense sought yet another competency evaluation, one that would apply retroactively such that a new trial would be required. The district court allowed a competency evaluation for sentencing but declined to make any finding of incompetency retroactive. In any event, the presentencing competency hearing mirrored those that came before trial: Nichols was competent.

At sentencing, the district court imposed a within-Guidelines sentence of Life. Nichols, with counsel's assistance,[*] now appeals. He challenges the district court's finding that he was competent to represent himself, its finding that he waived the right to counsel, and its application of the Sentencing Guidelines.

II

Nichols argues that the district court should not have let him represent himself. We break his objection into two parts:

---

[*] We appointed Erika Bierma of Axley Brynelson LLP to represent Nichols in this appeal. She has ably discharged that responsibility, for which we are grateful.

whether he was competent to stand trial and whether he knowingly and intelligently waived his right to counsel.

## A

To stand trial a defendant must have both a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (cleaned up). The district court, after ordering two competency evaluations, found that Nichols could stand trial. We review that determination for clear error. *United States v. Moore*, 425 F.3d 1061, 1074 (7th Cir. 2005).

Notably, Nichols does not challenge the district court's finding that he was competent to stand trial. Instead, he argues only that he was not competent to represent himself. Nichols says *Indiana v. Edwards*, 554 U.S. 164 (2008), required the district court to inquire into not only whether he was competent to stand trial, but whether he was competent to represent himself, too. He is mistaken. *Edwards* is a rule of permission, not requirement: Courts may restrict a defendant's right to represent himself if, and only if, he falls into a "grey area" of competence—where the defendant understands the proceedings against him but labors under serious delusions or suffers from otherwise debilitating mental infirmities. *Id.* at 175–78; see also *United States v. Berry*, 565 F.3d 385, 392 (7th Cir. 2009) ("Because both state and federal courts are bound to uphold the right to a fair trial (nixing trial of the mentally incompetent) and the right to self-representation, it follows that *Edwards* applies to the federal courts equally.") (cleaned up); *United States v. Anzaldi*, 800 F.3d 872, 879 (7th Cir. 2015) ("*Edwards* simply means that the Constitution *may* have

allowed the trial judge to block [the defendant's] request to go it alone, but it certainly didn't require it.") (cleaned up). One might argue that any defendant who thinks he can do a better job than able defense counsel labors under some sort of delusion. But the mere desire to exercise the right to self-representation is not a "serious delusion." "Both savvy and foolish defendants have a constitutional right to self-representation." *United States v. Johnson*, 980 F.3d 570, 578 (7th Cir. 2020).

Even if *Edwards* did require, rather than merely permit, a more searching inquiry of those seeking to represent themselves, "[s]evere mental illness appears to be a condition precedent [to *Edwards*'s applicability]." *Berry*, 565 F.3d at 391. In *Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016), we wrote that the narrow grey zone identified in *Edwards* addressed the "serious problem of the mentally ill or mentally impaired person, who cannot handle matters himself and who needs a lawyer almost in the capacity of a guardian." *Id*. at 845. We find no evidence that Nichols suffered from the type of serious delusions or debilitating infirmity *Edwards* contemplates. From the record, Nichols comes across at times as self-assured, obstinate, and a bit impulsive. At the same time, he could recognize inconsistencies, adjust his tone to his audience, and seek guidance when it would be useful. Indeed, Dr. Goldstein concluded that Nichols was competent to represent himself if he chose to do so. Nichols presented no evidence that he fell into the narrow category of defendants *Edwards* identified, so the district court had no occasion to consider whether a more searching inquiry was warranted.

The district court's finding that Nichols was competent to stand trial was far from clearly erroneous. Dr. Goldstein concluded that Nichols had ample familiarity with the criminal

justice system and the procedures that would be followed, with the charges and consequences he faced, and with the ramifications of electing to represent himself. Dr. Goldstein also found no evidence of a major psychological disturbance that would have impeded Nichols's ability to aid in his own defense. Dr. Fields (Nichols's expert) concluded that Nichols was "not really competent to stand trial … [b]ecause he's unable to comport himself effectively with representation that's been given him." This was so "[d]espite the fact that he understands fairly well the basic aspects of the court and all the things that go [on] in court basically, and he's done that very well." On this record, the district court was well within its discretion to disregard Dr. Fields's conclusion. Dr. Fields spent just 90 minutes with Nichols, never conducted the standard battery of tests (as Dr. Goldstein had), and rooted his conclusion—that Nichols could not assist his lawyers—in a vague "clinical sense" rather than a legally cognizable standard (i.e., competent or not).

An unwillingness to assist counsel is not an incapacity to do so. Coupled with the ample evidence that the district court reviewed (expert reports, jail calls, in-court demeanor), the district court's finding—after a contested hearing—that Nichols was competent to stand trial was not clearly erroneous.

B

A defendant may exercise his Sixth Amendment right to represent himself in two ways. The first is by an affirmative waiver of his right to counsel—a statement that the defendant wishes to go it alone. The second is through a constructive waiver—conduct evidencing a refusal to accept counsel's assistance and the limitations that accompany it. As a mixed question of law and fact, we give no deference to a district

court's legal conclusion that a defendant has constructively waived counsel, but we review the district court's underlying factual findings for clear error. *United States v. Balsiger*, 910 F.3d 942, 951–52 (7th Cir. 2018). In other words, we review whether a district court's finding that a defendant will not work with his counsel based on his statements, conduct, and so on—things the district court is best positioned to judge—for clear error. *Id*. But we decide for ourselves whether that refusal constitutes a knowing and intelligent waiver of counsel's assistance. *Id*. "Counsel plays a vital role in criminal proceedings, so we indulge every reasonable presumption against the waiver." *United States v. Jones*, 65 F.4th 926, 929 (7th Cir. 2023) (cleaned up).

1

The district court found that Nichols constructively waived his right to counsel by filing frivolous pro se motions and by refusing to work with his court-appointed counsel. That finding was not clearly erroneous.

Nichols tried to file motions that had no basis in law, so his lawyers refused to file them or, when they did, they noted their belief that the motions were frivolous. This led Nichols to believe that his lawyers were working against him and for the government. At the same time, Nichols repeatedly stated that he did not want to proceed pro se: He wanted different lawyers; he did not relish the idea of representing himself. But the right to counsel is not the right to counsel of one's choosing. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). And no defendant can insist that counsel make frivolous arguments. Likewise, "[a] defendant has no right to indefinite delays while he tries on new lawyers unless he has a [valid] reason for dissatisfaction with the old." *United States*

*v. Oreye*, 263 F.3d 669, 671 (7th Cir. 2001). It is beyond dispute that Graham and Winslow offered Nichols competent, highly experienced counsel. Nichols's desire that they abandon their ethical obligations was not a fair basis for dissatisfaction with their performance. The district court did not err by finding that no conflict of interest existed between them.

More than once, the district court acknowledged Nichols's desire to have a different lawyer appointed but reminded him that he was not entitled to one and that his only other option was to represent himself. Nichols may not have wanted to represent himself but by refusing the help of competent court-appointed counsel, he exhausted his options. "[W]here a defendant repeatedly complains of his appointed counsel the district judge may give him an ultimatum to either work with his attorneys or represent himself." *United States v. Volpentesta*, 727 F.3d 666, 676 (7th Cir. 2013). We have affirmed a district court's finding that a defendant elected to proceed pro se even though "he repeatedly asserted he was not waiving his right to counsel and relied on standby counsel." *Balsiger*, 910 F.3d at 954. That makes sense: "If you're given several options, and turn down all but one, you've selected the one you didn't turn down." *Oreye*, 263 F.3d at 670. Even indulging every reasonable presumption to the contrary, we have no basis to disturb the district court's finding that Nichols would not work with his appointed counsel. Our next task is to determine whether that constructive waiver was knowing and voluntary.

### 2

A defendant must be aware of the dangers and damages of self-representation so that the record will establish that he knew what he was doing and that his choice was made with

eyes wide open. *Faretta v. California*, 422 U.S. 806, 835 (1975).
The district court must conduct a thorough inquiry with a de-
fendant that probes his age, education, and understanding of
the charges against him and the potential consequences
should he be found guilty. *Johnson*, 980 F.3d at 577. Four non-
exhaustive and flexible factors guide whether a defendant's
waiver was knowing and intelligent:

> (1) whether and to what extent the district court
> conducted a formal hearing into the defendant's
> decision to represent himself; (2) other evidence
> in the record that establishes whether the de-
> fendant understood the dangers and disad-
> vantages of self-representation; (3) the back-
> ground and experience of the defendant; and
> (4) the context of the defendant's decision to
> waive his right to counsel.

*Id*. (quoting *United States v. Cooper*, 591 F.3d 582, 587 (7th Cir.
2010)). With these factors as our guide, we conclude that Nich-
ols's constructive waiver was knowing, intelligent, and vol-
untary.

Because the district court did not conduct a discrete *Faretta*
hearing, the first factor weighs against finding a knowing and
voluntary waiver. That conclusion is not dispositive, how-
ever, for we have never required a standalone inquiry. *Balsi-
ger*, 910 F.3d at 953. When the record demonstrates that a de-
fendant understood the risks of self-representation, the lack
of an exhaustive, standalone inquiry is of little significance.

Such is the case here. The record reveals that Nichols un-
derstood the tough road that pro se defendants must walk.
*Johnson*, 980 F.3d at 577. Across multiple hearings, the district

court engaged in a colloquy with Nichols about the penalties he faced, his deep familiarity with criminal proceedings, his prior experiences with both appointed and retained defense counsel, his educational history, the challenges that he would face in representing himself, and the experience and qualifications of his appointed counsel. The district court also looked to Nichols's conversations with friends and his statements to Dr. Goldstein, all of which conveyed that he was embracing the risks he faced. This evidence strongly supports the district court's finding of a knowing and voluntary waiver.

Nichols's background also favors a finding that his waiver was knowing and voluntary. Nichols graduated from high school and had some college education. More importantly, he had faced many criminal charges in the past—this was not a first-time defendant unwise to the complexity of a criminal case and its potential consequences. Prior experiences with defense counsel yielded mixed results for Nichols: sometimes they worked out; other times he fired them and retained private counsel. And on at least one occasion he was found not guilty with counsel's aid.

Beyond the responses Nichols gave during its inquiries, the district court also had the benefit of Dr. Goldstein's extensive report and her testimony at the competency hearing. She explained that Nichols was well acquainted with the charges against him. During her interview with him, Nichols explained his theory of his defense—that he never coerced any of his victims. He explained that a criminal complaint initiates a case; he understood the differences between grand and petit juries, as well as the roles of judges, jurors, prosecutors, and defense counsel. He even knew that the Sentencing Guidelines are just advisory. Moreover, Dr. Goldstein's report

canvassed Nichols's educational and behavioral history in great detail. The district court could rely on all of this when finding Nichols's waiver to be knowing and voluntary.

The final factor—the context of the defendant's waiver—weighs heavily against Nichols. "A waiver is likely knowing and voluntary if the defendant gave it for strategic reasons or after repeatedly rejecting the assistance of counsel." *United States v. England*, 507 F.3d 581, 588 (7th Cir. 2007). We've explained in detail the circumstances that led to the district court's decision to treat Nichols as a pro se defendant: Nichols wanted to make baseless arguments rather than accept counsel's help. He also was trying to get himself "up out of here and trying to find loopholes and shit." That his strategy failed makes it no less a strategy. Nichols insisted that he did not want to represent himself but, in this case, actions speak louder than his words. *United States v. Murphy*, 469 F.3d 1130, 1136 (7th Cir. 2006) ("[A] defendant can waive his right to counsel through conduct as well as words."). That does not mean, however, that his words do not have weight. At the close of the competency hearing, Nichols said, "I'd rather go to jail on my own. I'll work for myself than let somebody else send me to jail." Preferring to be the master of his own fate, Nichols strategically abandoned his right to counsel.

Taken together, the record reveals that Nichols's decision to reject the assistance of counsel was made knowingly and voluntarily. As it often does, that choice yielded results Nichols views as suboptimal. But it was a choice Nichols made with eyes wide open.

*

Confronted with a defendant who refused to work with counsel, the district court faced a choice. It could force Nichols

to accept counsel's help, in contravention of his Sixth Amendment right to represent himself. Or it could allow Nichols to represent himself and risk a claim that he was incompetent to stand trial, in contravention of his Sixth Amendment and due process rights. The district court chose correctly. Nichols was competent to stand trial and knowingly and voluntarily refused counsel's assistance. We affirm the district court's decision to allow Nichols to represent himself, a right the Constitution guarantees.

## III

Turning to sentencing, Nichols brings a procedural challenge to the district court's imposition of a life sentence, arguing that the district court erred in determining the base offense level applicable to Count 1, the conspiracy count. The gist of his argument focuses on the text of § 2G1.1(a) of the Sentencing Guidelines, which provides a base offense level of 34 "if the offense of conviction is 18 U.S.C. § 1591(b)(1)" and a base offense level of 14 if "otherwise." Since Nichols was convicted of violating 18 U.S.C. § 1594(c) as to Count 1, he says that his "offense of conviction" is "otherwise," yielding a base offense level of 14. The Probation Officer agreed with Nichols. Even though the PSR already calculated Nichols's final Guidelines range to be Life, the government objected. In its view, the correct base offense level for Count 1 was 34 because the conduct Nichols conspired to undertake (as evidenced by the other counts he was convicted of) was punishable by § 1591(b)(1). See U.S.S.G. § 1B1.3, cmt. n.7 ("Unless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy … ."). The district court

sided with the government, a decision Nichols now challenges.

Since Nichols's sentencing, circuits have split as to how § 2G1.1 should be applied to those convicted of violating § 1594(c). Compare *United States v. Wei Lin*, 841 F.3d 823, 825–27 (9th Cir. 2016) (agreeing with Nichols) with *United States v. Sims*, 957 F.3d 362, 363–64 (3d Cir. 2020) and *United States v. Carter*, 960 F.3d 1007, 1013–14 (8th Cir. 2020) (agreeing with the government and the district court).

We need not weigh in. As the district court observed, both before and after the government's objection, the Guidelines recommended Life—the sentence Nichols received. Any error in determining the base offense level as to the conspiracy count was therefore harmless beyond any doubt. *United States v. Anderson*, 517 F.3d 953, 965–66 (7th Cir. 2008).

AFFIRMED